UNITED STATES of America

v.

Victor Manuel GERENA, et al.

Crim. No. H–85–50 (TEC).

United States District Court, D. Connecticut.

July 7, 1987.

Albert S. Dabrowski, Carmen E. Van Kirk, John A. Danaher, III, Leonard C. Boyle, Asst. U.S. Attys., Stanley A. Twardy, Jr., U.S. Atty., David D. Buvinger, William J. Corcoran, Trial Attys., U.S. Dept. of Justice, Hartford, Conn., for plaintiff.

Juan R. Acevedo, Hartford, Conn., for Norman Ramirez Talavera.

James L. Sultan, Rankin & Sultan, Boston, Mass., for Ivonne Melendez Carrion.

Diane Polan, New Haven, Conn., for Elias Castro Ramos.

James Bergenn, Shipman & Goodwin, Hartford, Conn., for Carlos Ayes-Suarez.

Richard Reeve, Asst. Federal Public Defender, New Haven, Conn., for Isaac Camacho-Negron.

Linda Backiel, Philadelphia, Pa., for Antonio Camacho Negron.

Leonard I. Weinglass, New York City, for Juan E. Segarra-Palmer.

William M. Kunstler, Richard J. Harvey, New York City, for Filiberto Ojeda Rios.

Margaret P. Levy, Hartford, Conn., for Angel Diaz Ruiz.

Michael Deutsch, Chicago, Ill., for Orlando Gonzalez Claudio.

John Williams, New Haven, Conn., for Hilton Fernandez-Diamante.

Ronald L. Kuby, New York City, for Luis Colon Osorio.

Robert J. Maldonado-Rivera, Rio Piedras, P.R., pro se.

F. Mac Buckley, Buckley & Santos, Hartford, Conn., for Paul Weinberg.

Jacob Wieselman, Hartford, Conn., for Luz Berrios-Berrios.

Harold Meyerson, New York City, for Jorge Farinacci Garcia.

RULING ON THE DEFENDANTS' JOINT MOTION FOR CLARIFICATION ON THE ISSUE OF THE APPLICABILITY OF FIRST CIRCUIT LAW TO THE DEFENDANTS' TITLE III CLAIMS, OR IN THE ALTERNATIVE, FOR RECONSIDERATION

CLARIE, Senior District Judge.

On February 4, 1987, this Court ruled that "the law of the First Circuit governs with regard to the defendants' motions concerning the legality of the Government's electronic surveillance operations conducted in Massachusetts and Puerto Rico." *Ruling*, p. 15.[1] The defendants have moved for reconsideration of this determination. The Court has carefully considered the defendants' arguments, but finds that there is no sound basis for the claim that the Court's ruling was in error.

The defendants also press for a clarification of the Court's decision, and specifically seek a determination that the ruling does not apply to certain categories of Title III claims, more particularly, those involving issues of sealing. The defendants' motion for clarification is granted. The Court herein elaborates on the findings in its earlier opinion. The Court concludes, however, that the defendants are not entitled to their request that post-interception procedures be governed exclusively by the law of the forum, or that the forum apply its own exclusionary standards in the event of a finding that, under nonforum law, the evidence is tainted by illegality.

*Facts*

Following the October 30, 1983 rocket attack on the United States Courthouse and Federal Building at Hato Rey, Puerto Rico, federal law enforcement officials sought authorization to electronically monitor the conversations and activities of several of the defendants in this case. The Government sought authorization believing that the targeted individuals were involved in the attack. On April 27, 1984, Chief Judge Perez-Gimenez signed an order authorizing federal agents to electronically intercept oral and wire communications at three separate locations: 3384 Levittown Boulevard, Levittown, Puerto Rico; the three public telephones located across the street from the Levittown location; and apartment 11k, Condominium Los Frailes, located on Road # 833, at the intersection of Paz Granela, Guaynabo, Puerto Rico. Following these initial electronic interceptions, the Government expanded its surveillance activities to include other locations in Puerto Rico and elsewhere. As a result of these efforts, the Government gathered a large quantity of information about the defendants' criminal activities, and it is now the Government's claim, as set forth in the pending superceding criminal indictment, that each of the defendants participated in various illegal activities associated with the September 12, 1983 robbery of the Wells Fargo Depot in West Hartford, Connecticut.

---

1. References to Title III are to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq. The Court is mindful that Title III has recently been amended, but that such amendments do not apply to the present controversy.

Since the bank robbery occurred in Connecticut, the Government has chosen to prosecute the defendants in this jurisdiction. The surveillance operations themselves, however, (with one exception) were conducted at various locations within the jurisdiction of the First Circuit. The defendants have filed a number of motions challenging the legality of the Government's surveillance activities on several grounds. Specifically, they challenge, among other things, 1) the applications submitted by the Government to obtain authorization for the surveillance, 2) the procedures used by the supervising court in reviewing the surveillance requests, 3) the Government's methods of conducting the surveillance, and 4) the Government's methods of handling and preserving various items of evidence obtained in the course of the surveillance.

The defendants claim that the issues they have raised are governed by the precedent law of the Second Circuit, since Connecticut is the forum jurisdiction in which the trial is scheduled to take place. The Government, on the other hand, argues that the law of the First Circuit should control, since the electronic surveillance at issue occurred in Puerto Rico and Massachusetts under the supervision of the federal courts located there. The Court adheres to its prior finding that questions relating to electronic surveillance operations conducted within the First Circuit and supervised by its courts are governed by the laws of that jurisdiction. The Court reaffirms its previous ruling that if it should find that any material difference exists between the case law of the First Circuit and the case law of the Second Circuit with regard to the Title III issues raised, the Court will defer to First Circuit law.

## Discussion

■ The precise choice-of-law issue raised here has not been ruled upon in this or any other circuit. Nevertheless, general language from the Court of Appeals for this circuit suggests that the governing law should be that of the place where the electronic surveillance occurred. *United States v. Romano*, 706 F.2d 370, 376 (2d Cir.1983); *United States v. Cotroni*, 527 F.2d 708, 711 (2d Cir.1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976). The only relevant First Circuit decision adopts the same position, stating that "the law that controls the legality of an interception is the law of the place wherein the *interception* takes place." *United States v. Bennett*, 538 F.Supp. 1045, 1047 (D.Puerto Rico 1982) (emphasis in original). *See United States v. Tirinkian*, 502 F.Supp. 620, 627 (D.N.Dakota 1980), *affd. United States v. Wentz*, 686 F.2d 653 (8th Cir.1982) (the law of the point of interception governs the legality of the surveillance). But while these cases might appear to settle the question raised by the Government, a review of the facts of each demonstrates that they do not address the precise issue raised in the present controversy. Each involves the interception of international communications and a choice between the application of U.S. or foreign law in determining the legality of the surveillance. None discuss the precise issue of whether to apply the law of the forum jurisdiction over the law of the jurisdiction where the surveillance occurred when the two are different circuits within the United States. Accordingly, the lack of direct precedent renders this a case of first impression. Nevertheless, having carefully considered the fundamental policies embodied in the provisions of Title III; the realities of electronic surveillance litigation; the applicability of choice of law principles and their ability to shed some light on the present dilemma; and the relative benefits and disadvantages of various available alternatives, the Court finds that the lex loci approach applied in *United States v. Romano*, 706 F.2d at 376; *United States v. Cotroni*, 527 F.2d at 711; and *United States v. Bennett*, 538 F.Supp. at 1047, has application here, and furthermore, that it is the most logical and legally appropriate choice.

The defendants' objections to the Court's selection of the lex loci standard may be logically divided into three categories. First, the defendants deny that any legitimate conflict of law exists. They make

several legally distinct arguments in support of this position, namely that (a) inter-circuit disagreements are not properly subject to choice of law analysis; (b) the Court is not free to apply the law of another circuit where its own court of appeals has already spoken on the issue; (c) the Court lacks jurisdiction to apply the law of another circuit in this instance; and, implicitly, (d) the Court has no authority to adopt conflicts rules in criminal matters.

Second, the defendants claim that even if a conflict exists, the proper selection of applicable law is always that of the forum. In support of this claim the defendants argue that (a) in criminal matters, the forum always applies its own law; (b) in applying the law of the First Circuit, renvoi principles would direct the Court's choice back to the law of the forum;[2] and (c) that in undertaking an interest analysis approach, the interests at stake mitigate in favor of applying the law of the forum.

Third, the defendants argue that, even if nonforum law is selected for some issues, it cannot be selected for post-interception issues, and that with such challenges, the law of the forum always applies. In support of this claim the defendants argue that (a) post-interception issues, such as that of sealing, speak to the admissibility of evidence and that as such they are subject only to the law of the forum; and (b) the choice of a proper suppression remedy is exclusively a matter to be resolved under the laws of the forum and, therefore, consideration of nonforum law on this issue is foreclosed. The Court finds, however, that the defendants' arguments largely misconstrue the issues at stake and, further, that they are without merit considering the context within which they are made.

### A. The Invocation of Conflicts Principles

■ To fully address the defendants' claims, the Court turns, in part, to available conflicts principles to determine if in fact application of choice-of-law doctrine to intercircuit disagreements is foreclosed.[3] The Court finds that it is not. However, the Court also finds that its decision does not depend or turn on strict application of traditional conflicts standards or rationales. Instead, the Court has found that a sensitive balancing of the relevant issues (including close consideration of Title III itself; the legitimate interests of the parties; similar treatment of analogous criminal conflicts matters; the legitimate needs of law enforcement; the needs of our appellate systems;[4] important principles of comity;[5] the protection of justified expecta-

---

**2.** The defendants claim that even if a proper conflict exists, the application of renvoi principles would redirect the Court's choice of law back to its own jurisdiction. The Court finds however that the defendants' renvoi claim is misdirected: the First Circuit has not adopted any choice-of-law rule relevant to the questions at issue such as would throw the court's inquiry back to the law of the Second Circuit. Restatement, section 8.

**3.** More specifically, the defendants argue that a "'conflict' between Circuit Courts of Appeals is not a 'conflict' within the meaning of conflicts-of-law analysis," *Motion for Clarification of Court's Ruling*, filed [on behalf of all defendants] February 24, 1987, p. 13, and that "there is no [conflicts] dilemma where there is only one sovereign jurisdiction with one body of law." *Id.* at 18.

**4.** *See* Restatement, section 6, comment d ("[i]n formulating rules of choice of law, a [court] should have regard for the needs and policies of other [jurisdictions] and of the community of [jurisdictions] "); & f ("[i]n determining a question of choice of law, the forum should give consideration not only to its own relevant policies ... but also to the relevant policies of all interested [jurisdictions] ... [t]he forum should seek to reach a result that will achieve the best possible accommodation of these policies" ). *See also* note 12, *infra,* and accompanying text.

**5.** Principles of comity, where applicable, require judicial decisions to reflect the systemic value of reciprocal tolerance and goodwill. *See e.g. Illinois v. Gates,* 462 U.S. 213, 221, 103 S.Ct. 2317, 2323, 76 L.Ed.2d 527 (1983) (quoting *McGoldrick v. Compagnie Generale Transatlantique,* 309 U.S. 430, 434–35, 60 S.Ct. 670, 672–73, 84 L.Ed. 849 (1940) (" 'due regard for the appropriate relationship of [the Supreme Court] to state courts' ... demands that those courts be given an opportunity to consider the constitutionality of the actions of state officials, and, equally important, proposed changes in existing remedies for unconstitutional actions"); *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 111–12, 100 S.Ct. 937, 946–47, 63 L.Ed.2d 233 (1980) (quoting *Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 100, 58 S.Ct. 443, 446, 82 L.Ed. 685 (1938); and *Lloyd A.*

tions;[6] fairness to the parties concerned;[7] the ease with which the law of another circuit may be ascertained;[8] the value of non-intrusion into the orderly development of law as it is presently unfolding in another circuit pending Supreme Court disposition;[9] the interests of certainty, predictability, and uniformity of result;[10] the in-

terest in the deterrence of forum shopping;[11] and the ever-present interests of justice) demonstrates the propriety of the Court's lex loci approach. Because of the overarching importance of Title III in the Court's analysis, the Court begins its discussion with close consideration of the federal wiretap statute itself.

*Fry Roofing Co. v. Wood*, 344 U.S. 157, 160, 73 S.Ct. 204, 206, 97 L.Ed. 168 (1952)) ("this Court accords 'respectful consideration and great weight to the views of the state's highest court' on matters of state law ... and we customarily accept the factual findings of state courts in the absence of 'exceptional circumstances'"). Principles of comity are applicable in the context of inter-circuit conflicts. *See Factor's Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir.1981), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982) (a Court of Appeals of the Second Circuit will typically defer to the judgment of a Court of Appeals for another jurisdiction where the later "has essayed its own prediction of the course of state law on a question of first impression within the state ...").

6. *See* Restatement, section 6, comment g ("[g]enerally speaking, *it would be unfair and improper* to hold a person liable under the local law of one [jurisdiction] when he has justifiably molded his conduct to conform to the requirements of another [jurisdiction]"); and Discussion in Sections A–3 and B in text, *infra* (given that law enforcement officials conform their conduct to comply with the Title III requirements established by the courts which exercise supervisory authority over their surveillance activities, it would be manifestly unreasonable to subject them to the *conflicting standards* of another jurisdiction).

7. *See* Discussion in Section A–2, *infra* (in all fairness the legitimate interests of the parties lie with the application and development of the law of the place where the conduct occurred). *See also* note 4, *supra.*

8. *See* Restatement, section 6, comment j ("[i]deally choice-of-law rules should be simple and easy to apply"). In this instance it is abundantly clear that the law of any federal circuit is readily available to any court in the land.

9. This value is similar to principles of comity, but with a slightly different emphasis. To a large extent, the *well-recognized and respected* precedential/jurisdictional circuit boundaries permit a wide range of thought and debate on a variety of significant issues. Clearly, in resolving pressing and important questions of federal law, the Supreme Court frequently draws on the knowledge, thoughts, and experiences of the lower courts in formulating its own final resolution of any given issue. Differences among the circuits highlight this process. In recognition of

the obvious benefits obtained from such an open field, the Court has identified a value of non-intrusion, and seeks a resolution of the present choice of law dilemma with this value in mind. *See Miller v. United States*, 357 U.S. 301, 306, 78 S.Ct. 1190, 1194, 2 L.Ed.2d 1332 (1958) ("[i]n making reference to that law we are mindful of our policy of not interferring with local rules of law fashioned by the courts of the District of Columbia"). *See also United States v. Buck*, 813 F.2d 588 (2d Cir.1987); and Discussion of *Buck* in Section B of text, *infra.*

10. *See* Restatement, section 6, comment i ("[p]redictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal conquences of their transactions"). Clearly, law enforcement officials can be expected to carefully scrutinize the laws and interpretations of the laws of the jurisdiction within which they operate. Similarly, defendants have a legitimate expectation that law enforcement officials will conform their conduct to local standards. The Court finds that the important interests of certainty, predictability, and uniformity are best served here by the adoption of the lex loci standard. *See* Discussion in Section A–2 in text, *infra.*

11. In this regard, the Court has considered the reasoning undertaken in *United States v. Johnson*, 323 U.S. 273, 275–78, 65 S.Ct. 249, 250–52, 89 L.Ed. 236 (1944). There the Supreme Court recognized the value of preventing "the appearance of abuses, if not abuses, in the selection of what may be deemed a tribunal favorable to the prosecution." *Id.* at 275, 65 S.Ct. at 250. The Court upheld this value in the context of trial venue in criminal prosecutions. However, it is noteworthy in the context of conflicts analysis to the extent that such analysis also takes this constitutionally recognized value into consideration in directing the forum (under appropriate circumstances) to respect as controlling the laws of the location where the allegedly illegal conduct occurred. In adopting the lex loci approach, the Court explicitly seeks to prevent the appearance of abuse, if not actual abuse, in the event the Government should seek to introduce evidence illegally obtained in the nonforum location but considered legal in the forum under its prevailing interpretation of the same statutory provision. Accordingly, the Court views *Johnson* as presenting a further supportive rationale for the Court's approach.

### 1. Title III

To begin with, Title III regulates the interception and disclosure of private communications, *United States v. Cotroni*, 527 F.2d at 711; *United States v. Marion*, 535 F.2d 697, 700 (2d Cir.1976), and attempts to limit the circumstances under which electronic eavesdropping may be conducted. *United States v. Marion*, 535 F.2d at 700–01. Here, it is well-settled that "the Act's stringent and detailed procedures [were] designed to restrict electronic intrusions into privacy." *Id.* at 700. As the Supreme Court has observed, "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *Berger v. New York*, 388 U.S. 41, 63, 87 S.Ct. 1873, 1885, 18 L.Ed.2d 1040 (1967). And as the Court of Appeals in this circuit has added, "Title III ... attempts to heed the Supreme Court's admonitions as it prohibits, in all but a few instances, the interception and disclosure of wire or oral communications." *United States v. Marion*, 535 F.2d at 700.

Second, the provisions of Title III are not self-executing. They rely on court authorization and close judicial supervision, beginning with an application to a judge of competent jurisdiction and extending through the mandatory submission of progress reports and the continuing and constant process of authorization and approval. *Id.* at 700. Here, it is clear that the Act requires the supervising court to take a highly active role in overseeing the Government's activities with regard to the approved surveillance. *Id.* at 700–01.

Third, the nature of the interests sought to be protected through court supervision are no less than those guaranteed by the Constitution itself, requiring "scrupulous particularity as to the circumstances and reasons for an electronic search before permitting it to be authorized by the courts as a means of insuring that its scope will be limited and its invasion of privacy minimized." *United States v. Masciarelli*, 558 F.2d 1064, 1066–67 (2d Cir.1977).

Fourth, Title III attempts to balance the individual's interest in maintaining personal privacy with society's interest in gathering evidence of suspected crimes. *Id.* at 1066–67. As the courts have recognized, these two interests often conflict, *id.* at 1066. This in turn requires, in most circumstances, close court supervision as the means of maintaining a proper balance of interests.

Piecing these considerations together, the Court finds that Title III relies heavily on local judicial supervision to safeguard important rights and prevent unwarranted electronic intrusions into an individual's day-to-day activities and conversations. The fate of cherished rights, obviously placed at some risk by any form of electronic surveillance, rests to a large extent in the hands of the court that contemplates, approves, and supervises an electronic surveillance application. To a large extent, Title III's safeguards are designed to protect against illegitimate intrusions into privacy *before* they can occur. The role of the supervising court is thus of the utmost significance for it is axiomatic that once important privacy rights have been invaded, little is available to truly redress the grievous wrong that is suffered by one whose privacy has been unreasonably intruded upon. The suppression remedy available to the forum is designed predominantly to deter future wrongful police conduct, not to remedy any past transgression. Thus, as Title III suggests, responsibility vests in the local supervising authority to see that statutory guidelines are observed and that fundamental rights are not disregarded.

### 2. The Relevant Interests of the Parties

As an additional threshold consideration, the Court has also examined the relevant parties' relative interests in having First Circuit law apply in the present controversy. As previously noted, Title III's local vesting of responsibility obviously gives rise to a strong interest in the local courts with regard to their own interpretations and applications of the statute's provisions. A court engaged in collateral review of such decisions should recognize the supervisory authority's strong interest in applying its own laws, and should include consideration of this interest in formulating an

appropriate choice-of-law standard.[12] For the purposes of the Court's present inquiry, this recognition of the nonforum's interest as vested by the statute itself leads the Court to conclude that it should accord due deference to the laws of the jurisdiction where the surveillance occurred, especially in view of the fact that the controlling federal statute places such a strong emphasis on the critical role played by the these courts.

Consideration of the Government's interest in applying the law of the First Circuit leads the Court to the same conclusion. In addition to the responsibilities which Title III places in the hands of the local supervisory authority, the statute also places a heavy burden on the Government in terms of the procedures which it must follow in seeking and conducting electronic surveillance operations. These procedures are best characterized as a series of required showings, which are themselves designed to enable the local court to properly exercise its supervisory authority. Here the prosecutorial arm of the Government must initially demonstrate the propriety of its surveillance requests and must continually justify its activities in accordance with legal norms of the jurisdiction wherein the Government is conducting the surveillance. The Court is persuaded that it should recognize the Government's obvious interest in following the rules of the supervising court. The Court is also persuaded that this interest should be considered in determining whether a court exercising collateral review should judge the Government's conduct in accordance with its own rules or those of the place where the surveillance occurred. Recognizing that the Government's interest lies with application of the legal rules which bind the supervisory authority, the Court is again lead to the conclusion that the law of the First Circuit should control.

The defendants have a similar interest in having the Court apply First Circuit precedent. In challenging the Government's surveillance operations, the defendants seek the preservation of their civil liberties and the vindication of their rights in the event of any violation. Within this context, the scope of the defendants' rights, as they might expect to exercise them on a day-to-day basis, is to be found within the realm of First Circuit jurisprudence. Ordinarily, it would be the courts of that jurisdiction that would protect the defendants' interests and provide a civil remedy for any redressable wrong. In fact the First Circuit has already addressed several claims of Government overreaching with regard to at least one of the defendants in this case in the context of the Government's electronic monitoring of his conversations. *In re Application of the United States for an Order,* 723 F.2d 1022 (1st Cir.1983). Furthermore, first circuit courts have before them an action filed by certain defendants in this case wherein they allege that the Government violated their rights by improperly conducting certain electronic surveillance activities, including surveillance that has yielded evidence offered in the present criminal matter. *Isaac Camacho Negron v. Autoridad de Telefonos,* case no. 87–108 (D.Puerto Rico 1987). The point illustrated by these examples is that a defendant, in challenging the legality of any given electronic surveillance activity, would generally expect to look to the laws of the jurisdiction where the surveillance occurred to protect his or her privacy rights; and, in any event, any defendant can reasonably expect that the surveillance should be conducted in accordance with the laws of the jurisdiction of the supervising court. These observations demonstrate the nature of the defendants' strong interest in First Circuit law, an interest which this Court seeks to respect in resolving the present choice-of-law controversy.

### 3. The Need for the Adoption of a Lex Loci Standard

The Court next turns to a more detailed analysis of the legitimate needs of law

---

**12.** As recognized in the Restatement, "[t]he forum should ... appraise the relative interests of the [jurisdictions] involved in the determination of the particular issue. In general, it is fitting that the [jurisdiction] whose interests are most deeply affected should have its local law applied." Section 6, comment f.

enforcement officials and the conclusion that the lex loci approach is far less problematic in application than other available alternatives. To begin with, the Court accepts the proposition alluded to earlier that law enforcement officials operating within a particular circuit are presumptively aware of the requirements of Title III as explained by the Courts of that jurisdiction. This Court is unwilling to adopt a choice-of-law approach that would confuse this understanding. Any approach that would force law enforcement officials to look other than to the laws of the Courts that directly supervise their activities is likely to lead to chaos and be replete with procedural traps.

The Court is also persuaded that law enforcement officials conform their conduct to comply with the requirements established by the courts which exercise supervisory authority over their surveillance activities. A lex loci standard is preferable in this context due to the ease with which a law enforcement official may gauge his or her conduct in pursuing legal surveillance operations. A standard that would force an official to predict a possible future forum (as well as the laws peculiar to that forum) invites confusion and might lead to error and frustration, including the unacceptable consequences associated with such unfortunate working conditions. *See Wisconsin v. Kennedy,* 396 N.W.2d 765, 769, 134 Wis.2d 308 (App.1986) (citing *Desjarlais v. State,* 243 N.W.2d 453, 459–62, 73 Wis.2d 480, 491–98 (1976)) ("[t]he manner and method of obtaining evidence is governed by the law of the jurisdiction in which the evidence is secured.... [a] contrary conclusion would result in the unreasonable requirement that officials in one jurisdiction be aware of and implement the procedures adopted in a foreign jurisdiction").

One possible alternative to a strict lex loci approach would be to require the Government to conform its conduct to the standards of the surveillance jurisdiction, but only until the Government anticipates trial in another jurisdiction, whereupon it should then begin to conform to the rules of the forum jurisdiction. This anticipation standard, however, suffers from the same infirmities applicable to all other non-lex loci standards generally, and the Court is persuaded that the anticipation of trial envisioned by such a rule will typically arrive too late to serve the purposes such a rule might be argued to support. Such a standard might hamstring the prosecutorial arm of the Government where, for example, it became evident after the surveillance operations had begun, that several trials for different crimes might be had in several different circuit jurisdictions. Here the Government would have to attempt to comply with several, perhaps contradictory bodies of laws; a problem easily avoided through application of the lex loci standard.

As a final point, the Court accepts the proposition that supervising courts in charge of surveillance operations conducted within their jurisdiction are undoubtedly intimately familiar with the innumerable tangible and intangible aspects of the particular operations they are called upon to administer and supervise. Such courts have presumptively formulated conditions and rules tailored to protect important rights peculiarly implicated in the particular operations these courts oversee. Since Title III envisions close supervision, this Court is reluctant to interfere with the policing functions entrusted to these courts. Thus, the Court prefers a choice-of-law approach that is sensitive to the policing role of the supervisory forum. Because the lex loci standard is non-intrusive in this context, it is the preferrable approach.

These considerations establish the desirability of applying a lex loci standard to the defendants' Title III claims. Such an approach is consistent with the overall process envisioned by Title III. Furthermore, as explained below, the lex loci standard also comports with principles of comity as applied by the courts of this circuit in other contexts. The Court now turns to specific consideration of more generic choice-of-law standards to see if they support the defendants' challenge in any meaningful way.

#### 4. Applicable Conflicts Principles

The Court here turns to an examination of various conflicts principles in order 1) to determine their relevance to the present controversy; and 2) to determine if their application supports or contradicts the Court's approach. Addressing the defendants' claims and reasoning by analogy, the Court finds that conflicts issues have been recognized in numerous contexts by a number of courts regardless of the fact that the matter is criminal in nature, that there is in fact only one sovereign law involved, or that the dispute focuses merely on differing interpretations of the same law. Furthermore, proper consideration of applicable conflicts principles demonstrates that they support the Court's standard.

As explained in the Restatement, Second, Conflict of Laws, "Conflict of Laws covers an extremely wide area, embracing all situations where the affairs of men cut across state lines." Section 2, comment c. As defined by the Restatement, "state" means any "territorial unit with a distinct general body of law" and is expressly *not* limited according to notions of sovereignty or political boundaries. *Id.*, section 3 & comment c. Moreover, the law of a state is also broadly defined to include "the body of standards, principles and rules ... which courts of that state apply in the decision of controversies brought before them" and is thus not confined solely to the narrow definition of "law" offered by the defendants. Accordingly, "law" may properly include differing "interpretations" of the law. *Id.*, section 4.

It should be noted that while the Restatement explicitly states that it does not deal in depth with the "special Conflict of Laws problems presented by criminal law," it does explain that "[m]any of the principles stated in this restatement, however, are applicable to criminal law." *Id.* section 2, comment c. Furthermore, in analyzing conflicts in the criminal context courts have frequently looked to the Restatement for guidance.

##### a. Intercircuit Conflicts

The Court is, in reality, presented with a choice between applying the interpretive rules of decision of one subdivision of the Federal Judicial System over another. As recognized in the Restatement, section 2, comment c.:

> A state is customarily subdivided into a number of territorial divisions, as counties, cities, towns and villages. To the extent that these divisions have their own separate law and courts, their existence gives rise to problems analogous to those dealt with in the Restatement of this Subject.

Like intrastate divisions, the division of the nation into circuits is an intrafederal jurisdictional scheme. To the extent that each circuit has its own body of binding precedent (uniformly regarded as binding only within defined jurisdictional limits) then, in the absence of authoritative Supreme Court disposition of the particular issue in question, differences among the circuits give rise to intrafederal disputes and thus genuine conflicts within the general meaning of conflict of laws analysis, and require a choice to be made where the interests of the nonforum jurisdiction are significant. Under general principles of modern conflicts analysis, the reality of the existence of a genuine choice in this context cannot, in fact, be avoided.

##### b. State/State Conflicts and the Lex Loci Standard

For the Court's present comparative purposes, the Court finds 1) that the states are in a position roughly similar to that of the circuits; 2) that the states recognize interstate conflicts in criminal matters even as to federal issues; and 3) that the states generally determine the legality of alleged police conduct through application of the law of the place where the conduct occurred. Reaching the first point, the Court observes that both state and federal courts are bound by the relevant Supreme Court interpretations of federal statutory and constitutional law, but, in the absence of direct precedent, their separate interpretations remain binding solely within their respective jurisdictional spheres. Thus, examination of state court experience in criminal conflicts matters may, to a limited

extent, help in the formulation of an inter-circuit standard.

Addressing the second point, state courts have noted that "[c]onflicting state views concerning the scope of the fourth amendment and of the additional rights granted to a party by a state present a novel situation in the area of conflict of laws." *People v. Saiken*, 275 N.E.2d 381, 385, 49 Ill.2d 504 (1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1499, 31 L.Ed.2d 796 (1972). *Saiken* itself involved consideration of a crime committed in Illinois as evidenced in part by an illegal search conducted in Indiana. 275 N.E.2d at 384. The defendant claimed on appeal that the Indiana search had been improperly conducted under the laws of that jurisdiction and that the evidence should therefore have been suppressed by the trial court. In analyzing the issue the court applied an interest-balancing approach adapted from the Restatement. *Id.*, 275 N.E.2d at 385. This case, and others like it, illustrate how courts overseeing criminal matters do in fact formulate appropriate conflicts rules tailored to the specific needs of the criminal issues at stake whenever the case transcends jurisdictional boundaries in significant respects.

Finally, the choice-of-law approachs adopted by the states in criminal conflicts contexts specifically include lex loci applications. The Court finds further support for its lex loci approach in some of the rules adopted by these courts in reaching criminal conflicts issues. As one commentator observes, "[t]he courts have had little difficulty in determining that the law of the jurisdiction wherein the [allegedly illegal police] conduct took place determines the legality of the conduct." Theis, *Choice of Law and the Administration of the Exclusionary Rule in Criminal Cases*, 44 Tenn.L.Rev. 1043, 1045 (1977). *See State v. Rector*, 729 P.2d 1, 5 n. 4, 82 Or.App. 466 (1986), *review denied*, 302 Or. 614, 733 P.2d 449 (1987) (citing *Miller v. United States*, 357 U.S. 301, 306, 78 S.Ct. 1190, 1194, 2 L.Ed.2d 1332 (1958); *United States v. Di Re*, 332 U.S. 581, 589–90, 68 S.Ct. 222, 226–27, 92 L.Ed. 210 (1948); *Menefee v. State*, 640 P.2d 1381, 1384 (Okl.Cr.1982); *Six Feathers v. State*, 611 P.2d 857, 861 (Wyo.1980); *State v. Coleman*, 579 P.2d 732, 743, 177 Mont. 1, 18 (1978), *cert. denied*, 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980); *State v. Cooper*, 573 P.2d 1006, 1008, 223 Kan. 175, 176 (1977)) ("[g]enerally, the law of the state in which a warrantless arrest is made determines the validity of the arrest"); *State v. Kennedy*, 396 N.W.2d 765, 769, 134 Wis.2d 308 (App.1986) ("[t]he manner and method of obtaining evidence is governed by the law of the jurisdiction in which the evidence is secured"); *Jones v. Commonwealth*, 323 S.E.2d 554, 560–61, 228 Va. 427 (1984), *cert. denied*, 472 U.S. 1012, 105 S.Ct. 2713, 86 L.Ed.2d 728 (1985) (Hawaiian law applied to inventory search issue); *People v. Blair*, 602 P.2d 738, 747–48, 25 Cal.3d 640, 159 Cal.Rptr. 818, 827–28 (1979) (phone records legally obtained in Pennsylvania under local and federal standards found admissable in California court even though they would have been inadmissable had they been seized in the same manner within the forum); *Dickerson v. State*, 200 So.2d 487, 489–90, 43 Ala.App. 694 (1967), *cert. denied*, 200 So.2d 492, 281 Ala. 718 (1967), *cert. denied*, 389 U.S. 994, 88 S.Ct. 496, 19 L.Ed.2d 489 (1967) (Mississippi law applied to determine the validity of the arrest).

As the defendants readily concede, conflicts between the circuits, like conflicts between the states, are numerous and occur frequently given the unavoidable reality that reasonable minds will inevitably differ on some constructive points of statutory or constitutional interpretation. *Transcript of Proceedings of March 25, 1987*, p. 219 (remarks of Attorney Bergen). Faced with this reality, the Court finds that, similar to the standard adopted by the state courts, and in keeping with the federal standard adopted where the conflict arises between U.S. and international law, the legality of the alleged improper conduct should be determined by reference to the law of the circuit where the conduct occurred.

### Analogous Federal Precedent

Turning to legitimate precedental considerations,[13] the Court finds that analogous federal decisions reaching issues similar to the questions addressed here support the adoption of a lex loci approach. To begin with, the defendants' suggestion that the Court would be acting improperly if it were to apply a type of conflicts analysis flies in the face of the reality that federal courts already routinely apply such analysis in numerous contexts, most notably in civil matters, and in criminal cases involving foreign elements. As suggested above, the Court would be bound by prior Second Circuit precedent to apply a lex loci approach if the electronic surveillance had been conducted in another country. *United States v. Romano*, 706 F.2d at 376; *United States v. Cotroni*, 527 F.2d at 711. Similarly, if foreign officials conducted a legal serch or seizure in their own country under their own laws, this court would not apply the strictures of the Fourth Amendment or its exclusionary rule where U.S. officials had not participated in any wrongdoing in the search or seizure. *United States v. Busic*, 592 F.2d 13, 23 (2d Cir. 1978); *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir.1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). *See United States v. Toscanino*, 500 F.2d 267, 280 (2d Cir.1974) (U.S. officials acting in foreign lands are bound by the Fourth Amendment when conducting investigations of U.S. citizens). Likewise, a foreign officer's failure in a foreign jurisdiction to give *Miranda* warnings prior to a custodial interrogation does not invalidate a subsequent confession obtained as a result of the interrogation even though such would invalidate the confession were it so obtained within the United States. *United States v. Welch*, 455 F.2d 211, 213 (2d Cir.1972) (provided the confession was voluntary). These cases demonstrate a normal and routine deference to foreign procedures in certain criminal matters. There is no suggestion in any of these opinions that the Court acts improperly by evaluating the legality of the allegedly illegal conduct by reference to the laws of the place where the conduct occurred. Indeed, as has been aptly demonstrated, precedent requires this approach where the electronic surveillance is involved as a foreign element in the case.[14]

In criticizing the Court's approach, the defendants argue that adoption of the court's standard for intercircuit disputes would be unpalatable in application. The defendants suggest that a court would be hard-pressed to disregard its own precedent and adopt that of another jurisdiction where the conduct occurred in the latter and where the two bodies of law conflict.[15]

---

13. The defendants further challenge the court's ruling with the argument that a district court is not free to apply the precedent law of another jurisdiction, and must adhere to the rulings of its own Court of Appeals. *Motion for Clarification of Court's Ruling*, pp. 14–15. The defendants add that "it is 'clear' that it is not within the province of district courts to resolve conflicts between the various circuit courts...." *Id.* at 16–17. The Court agrees that it is bound by applicable precedent of this circuit. However, the court of appeals for this circuit (or any other for that matter) has yet to rule on its understanding of the correct resolution of the choice-of-law difficulties addressed here. Accordingly, this Court is not bound by any precedent directing it to adopt some approach other than the one the Court has found to be the most appropriate. In adopting the lex loci standard, the Court merely seeks to respect the existence of competent jurisdictional spheres, rather than blurr those boundaries by disregarding the significant and real problems at issues in the present controversy.

14. The Court notes that the Rules of Criminal Procedure themselves provide that a court should look to and apply foreign law under appropriate circumstances. Rule 26.1. The Court finds that this directive offers some tangential support for the proposition that the Court must not direct a blind eye to the laws of other jurisdictions under appropriate circumstances. Although Rule 26.1 speaks of foreign law in the sense of the law of another nation, the Court concludes that this fact does not entirely destroy the value of the analogy.

15. In arguing that the law of the forum should always apply, the defendants refer to the old disagreement between the Fifth and Second Circuits over a "good-faith" exception to the exclusionary rule in the years prior to the the Supreme Court's decision in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Fifth Circuit established such an exception four years prior to *Leon*. The Second Circuit refused to adopt such a rule. The defendants point out that, in the years prior to

922

In response, the Court notes that the difficulty articulated by the defendants is in reality not significantly problematic.

Ideally, perhaps, there would never be a need to apply different standards to similar cases brought within the same jurisdiction. But the difficulty revealed by the defendants' illustration is one that is frequently encountered in numerous choice-of-law contexts and is inherent in any system that requires one court (in certain contexts) to respect the laws of another jurisdiction. This difficulty has not stopped the courts from applying the laws of another jurisdiction where circumstances have required them to do so.

To begin with, Federal courts routinely face the dilemma articulated by the defendants in a variety of contexts, most notably where, pursuant to diversity jurisdiction, a court finds itself obliged to apply laws with which it has had no prior experience, and which may yield a result at odds with the laws of the state wherein the court is located.[16] Within the diversity context, it is the rule of this circuit that a court of appeals here should typically defer to the judgment of a court of appeals of another jurisdiction where the latter "has essayed its own prediction of the course of state law on a question of first impression within the state...." *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir.1981), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982). While the decision in *Factors* is not directly applicable to the facts of this case, the reasons underlying the approach taken by the majority in that decision point toward the adoption of the

lex loci approach urged by the Government. This Court is persuaded that the sound principles of comity articulated in *Factors* suggest that this Court should also defer to the laws of the circuit wherein the allegedly defective Title III activities occurred. Principles of comity, however, serve as merely one of several reasons for the Court's adoption of the lex loci standard.

In addition, the Court has carefully considered the Second Circuit's recent decision in *United States v. Buck*, 813 F.2d 588 (2d Cir.1987). In *Buck* the Court of Appeals considered the issue of whether the New Jersey state police had conducted an impermissable search on the basis that the warrant failed to adequately particularize the targeted items to be seized. Finding the warrant to be impermissably broad, the Court nevertheless found that the executing officers had acted in good faith, and that that they could not at the time have been expected to know that the warrant violated the Fourth Amendment. The illuminating aspect of the *Buck* opinion for the Court's present purposes is the Second Circuit's reference to Third Circuit law (the circuit encompassing New Jersey, the place of the search) for some guidance in gauging the standard of knowledge attributable to the executing officers. It is significant that only after finding that the Third Circuit had not addressed the issue at bar did the Second Circuit resolve it according to its own standards. *Id.* at 593.

As discussed in *Buck*, application of the good faith exception to a particularity violation is a matter of dispute among the circuits. *Compare United States v. Buck*,

*Leon,* if the lex loci rule were applied, a Second Circuit court, contemplating the suppression of evidence seized within the Fifth Circuit based upon a defective Fifth Circuit search warrant, would have had to consider the Fifth Circuit's good faith exception rule despite the rejection of such a rule by the courts of its own jurisdiction. The defendants argue that this would create an intolerable difficulty.

16. Pursuant to *Klaxon v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), federal courts sitting in diversity routinely apply local conflicts rules in a variety of situations. For example, this Court would generally apply the Restatement approach in

resolving choice-of-law issues in diversity tort situations. *See O'Connor v. O'Connor*, 201 Conn. 632, 519 A.2d 13 (1986) (adopting the Restatement's interest analysis standard). *Klaxon,* however, has no specific application in federal criminal matters, thus leaving the courts free to supply general rules of decision where none are provided for by Congress, but where the circumstances demand resolution in order to avoid obstructing the administration of justice. Nothing implicit in *Klaxon*, or inherent in the application of conflicts rules in the exercise of diversity jurisdiction, suggest that this Court's jurisdiction or authority is jeopardized by the application of conflicts rules in criminal matters in the manner chosen by the Court.

813 F.2d at 592–93; *United States v. Accardo*, 749 F.2d 1477, 1980–81 (11th Cir. 1985), *cert. denied*, 474 U.S. 949, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985), *with United States v. Fuccillo*, 808 F.2d 173 (1st Cir. 1987), *cert. denied*, —— U.S. ——, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987); *United States v. Crozier*, 777 F.2d 1376, 1381–82 (9th Cir.1985). Thus the reference to Third Circuit law prior to resolution of the issue suggests a sensitivity to jurisdictional boundaries and the binding authority of circuit court decisions within their territorial spheres of influence. Presumably the court would not have determined that the New Jersey officers were acting in good faith had they conducted their search in direct violation of Third Circuit standards. *See Buck*, 813 F.2d at 593 n. 2. Presumably the same result would obtain even if the Second Circuit disagreed with the Third Circuit's hypothetical approach.

Concerning Title III matters, the Court finds that reference to the law of the place where the conduct occurred is even more compelling than it is with good faith questions. Compared to search warrant procedures, court supervision under Title III is more pervasive, continuous, and pronounced, and covers all aspects of any electronic surveillance operation rather than just the issuance of a warrant. Thus, given the close mandatory interrelationship between local law enforcement officials and the courts, the interest in the application of supervisory law is even stronger under Title III than it might be in other contexts.[17]

C. Jurisdictional Limitations

The defendants argue further that the structure of the federal court system denies the district court the "opportunity to consider choice-of-law analysis" in the context of interdistrict or intercircuit "conflicts." *Motion for Clarification of Court's Ruling*, p. 21. The defendants' suggest that, in applying First Circuit law this court would be acting without jurisdiction. *Transcript of Proceedings of March 25, 1987*, p. 154 (remarks of Attorney Bergen). The Court disagrees and finds that the defendants' argument on this point is entirely without merit.

The Court's jurisdictional foundation rests squarely on 18 U.S.C. section 3231 which provides that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the

---

**17.** In taking the approach that it does, the Court notes out that at least one other court appears to have implicitly applied a lex loci standard. Here the Court refers to the decision in *United States v. Cox*, 567 F.2d 930 (10th Cir.1977), *cert. denied*, 435 U.S. 927, 98 S.Ct. 1496, 55 L.Ed.2d 522 (1978) (*Cox III*). The facts of that case reveal that law enforcement officials investigating certain alleged narcotics violations obtained permission for a wiretap in Missouri (Eighth Circuit). The tap revealed information implicating the defendant in a bank robbery in Kansas (Tenth Circuit). The defendant was convicted in Kansas of the Kansas robbery and the conviction was affirmed. *United States v. Cox*, 449 F.2d 679 (10th Cir.1971), *cert. denied*, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972) (*Cox I*). The defendant was also convicted in Missouri for violating federal narcotics drug laws, and that conviction was also affirmed. *United States v. Cox*, 462 F.2d 1293 (8th Cir. 1972), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974) (*Cox II*). In *Cox III* the Court of Appeals for the Tenth Circuit addressed a motion by the defendant for a new trial, wherein the defendant alleged certain improprieties in the electronic surveillance activities conducted in Missouri (Eighth Circuit). Specifically, the defendant cited a failure to minimize as grounds for suppressing the evidence obtained through the Missouri tap. Previously, the Eighth Circuit had dismissed his minimization claim in *Cox II*. In *Cox III*, the defendant argued to the Tenth Circuit that the law of the Eighth Circuit had changed subsequent to the Eighth Circuit's decision in *Cox II*, and that under the new Eighth Circuit standard (purportedly articulated in *United States v. Losing*, 539 F.2d 1174 (8th Cir.1976), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977)) the wiretap evidence should have been suppressed at his trial in Kansas on the bank robbery charges (*Cox I*, Tenth Circuit). In *Cox III* the Tenth Circuit rejected the contention that *United States v. Losing* altered the Eighth Circuit's standard as applied in *Cox II* (Eighth Circuit). What is significant for the purposes of the present controversy is that the Tenth Circuit looked, at least in part, to the Eighth Circuit's standard regarding minimization to determine whether the Missouri tap (Eighth Circuit) should have been suppressed in the Kansas trial (*Cox I*, Tenth Circuit). While the decision in *Cox III* does not expressly analyze the choice-of-law problem presented here, the decision does at least point in the direction of applying a lex loci rule in wiretap suppression cases.

States, of all offenses against the laws of the United States." Nothing in this section supports the defendants' position. To the contrary, "[t]he district court is a court of record having general jurisdiction over criminal cases arising under the criminal laws of the United States." *Wilson v. United States*, 166 F.2d 527, 528 (8th Cir. 1948). To the extent that the laws of the First Circuit have had some impact on certain elements of this case, the Court cleary possesses the authority to consider their effect within the purview of its general criminal jurisdictional powers. Thus, whereas it would be a denial of due process for this Court to act without jurisdiction, no such denial occurs where, as here, the application of conflicts principles falls squarely within the Court's authority.

In considering the defendants' claims, the Court has also reviewed 28 U.S.C. sections 41 et seq. (organization of the federal courts) & 1291 et seq. (jurisdiction and venue of the federal courts). The Court has found, not surprisingly, that none of these provisions in any way support the conclusion that the court would be acting without jurisdiction should it apply a conflicts of law analysis to the problem of inter-circuit differences addressed here. Indeed, the absence of any support in these provisions for the defendants' claim serves as further evidence that their assertion is entirely unfounded.[18]

### D. The Lex Loci Approach and Post-interception Issues

The Court's inquiry at this point shifts to consideration of the defendants' claim that, even if the legality of the Government's conduct is to be judged according to the law of the place where it occurred, the forum must nevertheless apply its own exclusionary approach rather than the standard formulated by the nonforum.[19] The Court finds on the basis of its examination of the issues that the proper suppression standard to apply is that of the federal jurisdiction in which the allegedly illegal conduct took place.[20]

18. The defendants also challenge the Court's authority to adopt conflicts rules in the present matter. However, as the defendants concede, there is a body of federal common law which permits the courts to rule on issues not previously determined by decision or statute where required in aid of statutory interpretation or the just administration of federal laws. *Motion for Clarification*, p. 21. As recognized in the Restatement, conflicts rules "are largely decisional" and originally arose as a part of the common law. Section 5 & comment c. Thus they are malleable, and, in the absence of a specific statutory conflicts directive, they may be tailored to suit the particular circumstances of the case at hand. *Id.* comment c. In this regard, conflicts rules are similar in nature to numerous other bodies of decisional law formulated by the federal courts in the past, and may be adopted pursuant to this Court's supervisory authority. *See McNabb v. United States*, 318 U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943). For example, as stated in *Wolfle v. United States*, 291 U.S. 7, 12, 54 S.Ct. 279, 78 L.Ed. 617 (1934), rules controlling the competence of witnesses in criminal trials in federal court "are governed by common law principles as interpreted and applied by the federal courts in the light of reason and experience." *Id.* at 12, 54 S.Ct. at 279 (now embodied in Rule 26. *See Lutwak v. United States*, 344 U.S. 604, 614, 73 S.Ct. 481, 487, 97 L.Ed. 593 (1953)). The Court regards the reasoning underlying this approach as supportive of the conclusion that this Court possesses some authority to consider and re-

solve the present conflicts problems as part of its general powers to fashion rules in the absence of an applicable statute or Rule resolving the issue.

19. The Court also reaches the question of whether post-interception issues should nevertheless be governed by the law of the forum. The Court finds that post-interception procedures, such as that of sealing, are themselves equally subject to local court supervision and that any attempt to distinguish them from pre-interception procedures for the narrow purposes of this ruling would be a meaningless endeavor. Thus, whether or not the tapes at issue in this case were properly sealed pursuant to the requirements of Title III is to be determined through application of First Circuit precedent to the extent that it differs with that of this jurisdiction.

20. The Court recognizes that cases in this circuit do draw a distinction between pre- and post-interception issues. However, this distinction has been made for reasons not applicable to the issues examined in this ruling. *See United States v. Sotomayor*, 592 F.2d 1219, 1225-26 (2d Cir.1979), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979) ("whatever interest, if any, the state may have in securring federal enforcement of its sealing requirements through application of the exclusionary rule is outweighed by the federal interest in establishing its own standards for the admission of lawfully obtained wiretaps into evidence"). The present

In certain situations courts will draw a distinction between questions of legality and questions of admissibility. *See e.g. State v. Kennedy*, 396 N.W.2d 765, 769, 134 Wis.2d 308 (App.1986) (although evidence was obtained illegally in Minnesota, the Wisconsin court applied its own exclusionary rules and found the evidence admissible); *People v. Blair*, 602 P.2d 738, 747–48, 25 Cal.3d 640, 159 Cal.Rptr. 818, 827–28 (1979) (Court refused to exclude evidence obtained in another jurisdiction even though it would have been illegal and inadmissable if obtained in the same manner in California). The cases demonstrate that, under appropriate circumstances, even though the courts typically look to the law of the place where the conduct occurred to determine its legality, they nevertheless apply their own exclusionary standards in deciding whether or not to suppress the fruits of the illegal conduct (e.g. evidence obtained in the nonforum as a result of an illegal search, seizure, interrogation, arrest, or electronic surveillance). *See* Theis, *Choice of Law*, at 1045.[21] This bifurcated approach, however, has no application where the conflicting jurisdictions are both federal forums.[22]

For example, state courts routinely apply the bifurcated approach outlined above to admit evidence illegally obtained under the state laws of a nonforum state jurisdiction. In *People v. Orlosky*, 40 Cal.App.3d 935, 938–39, 115 Cal.Rptr. 598, 600–601 (1974), the California Supreme Court addressed the question of whether the California trial should have suppressed evidence illegally obtained in Indiana. The court considered the application of its own exclusionary rule but found that the rule's underlying purposes of deterrence and the preservation of judicial integrity would not be served through the suppression of the fruits of nonforum illegality. The Court accordingly declined to suppress the evidence.

issue is whether to respect the rules of another federal forum with regard to federal wiretap activities. Thus, limits on the extent to which a federal court will recognize state law in determining whether or not to suppress the fruits of state wiretap investigations *do not control*. While some issues are similar (e.g. the interest in discouraging "federal forum-shopping [for]tainted evidence"), others are peculiar to federal-state interactions (e.g. "a state's protection of privacy [implicating] principles of federalism"). *Id.* at 1225. And while consideration of the Supremacy Clause and other important federal interests may permit a federal court to disregard certain laws, rules, interpretations, and procedures applied in state courts, these considerations have little bearing on the Court's examination of purely intra-federal disputes. Here the interests of a federal nonforum are not so readily disregarded. Here there is no supremacy device available to tip the balance in favor of the forum. Indeed, in the present case, sensitive consideration of the full range of issues and interests involved overwhelmingly directs this Court to fully respect the law of the place where the surveillance occurred. *See* notes 4–12, *supra.* Accordingly, the defendants' suggestion that the law of the forum should supercede that of the nonforum in the same manner as it might were the nonforum a state jurisdiction must be denied.

21. In practical effect, application of this bifurcated approach to Title III sealing matters would result in the application of First Circuit law only to issues concerning the legality of the seal, such as 1) whether a seal must be placed on each tape rather than on a single box containing a number of tapes; 2) whether the tapes must be sealed upon the expiration of each order or upon the expiration of a series of continuous extensions of an order; or 3) whether the Government will be permitted a grace period of one or more days before they must present the tapes for sealing. Conversely, questions of whether suppression is required for improper sealing, such as 1) whether improperly sealed tapes should be excluded in the absence of tampering; or 2) whether a lengthy delay requires exclusion, would be reviewed under the forum's interpretations of Title III's exclusionary provisions.

22. The defendants suggest that, whereas questions of legality are "substantive" (and therefore may be governed by the law of the place where the conduct occurred), questions of suppression are "procedural" and are therefore to be governed exclusively by the law of the forum. However, as far as Title III is concerned, the suppression remedy flows directly from specific statutory mandate and is anything but "procedural." Regardless, even if Title III's exclusionary provisions could somehow be classified as "procedural," there is no logical reason why a procedural/substantive distinction should be drawn with regard to intercircuit conflicts matters. The Court does not presently deal with the intricacies of state versus federal law. Within the present exclusively federal context, the Court sees no reason to complicate the issues raised by the introduction of vague evidentiary concepts. *See* note 20, *supra.*

■ Similarly, federal courts routinely admit evidence obtained in violation of state, but not federal standards. As noted in *United States v. Ragusa*, 586 F.Supp. 1256, 1258 (E.D.N.Y.1984), *affd. in pertinent part, United States v. Aiello*, 771 F.2d 621 (2d Cir.1985) (quoting *United States v. Butera*, 677 F.2d 1376, 1380 (11th Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983)) "[i]n the area of wiretap evidence the general rule is that 'federal law controls the admissibility of tape recordings in federal criminal cases and complaints that the evidence was obtained in violation of state law are of no effect.' "[23] Thus, federal courts considering the admission of evidence illegally obtained under state law, and state courts considering the admissibility of evidence illegally obtained pursuant to nonforum state standards, typically need not and do not apply the exclusionary devices of the nonforum. *Preston v. United States*, 376 U.S. 364, 366, 84 S.Ct. 881, 882, 11 L.Ed.2d 777 (1964); *Rios v. United States*, 364 U.S. 253, 255, 80 S.Ct. 1431, 1433, 4 L.Ed.2d 1688 (1960); *Elkins v. United States*, 364 U.S. 206, 224, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960); *United States v. Turner*, 558 F.2d 46, 49 (2d Cir.1977); *United States v. Mejias*, 552 F.2d 435, 444 (2d Cir.1977), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977); *United States v. Magda*, 547 F.2d 756, 757 n. 2 (2d Cir.1976), *cert. denied*, 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977); *United States v. Burke*, 517 F.2d 377, 382 (2d Cir.1975); *United States v. Beigel*, 370 F.2d 751, 756 (2d Cir.1967), *cert. denied*, 387 U.S. 930, 87 S.Ct. 2049, 18 L.Ed.2d 989 (1967); *State v. Lucas*, 372 N.W.2d 731, 736–37 (Minn. 1985); *State v. Beach*, 705 P.2d 94, 106 (Mont.1985); *State v. Konzelman*, 498 A.2d 1301, 1303–304, 204 N.J.Super. 389 (1985); *State v. Fellows*, case no. 3265, slip op. (Ohio 1985) [Available on WESTLAW, OH–CS database]; *People v. Blair*, 602 P.2d 738, 747–48, 25 Cal.3d 640, 159 Cal. Rptr. 818, 827–28 (1979); *People v. Saiken*, 275 N.E.2d 381, 385, 49 Ill.2d 504 (1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1499, 31 L.Ed.2d 796 (1972); *Burge v. State*, 443 S.W.2d 720, 723 (Tex.Cr.App.1969), *cert. denied*, 396 U.S. 934, 90 S.Ct. 277, 24 L.Ed.2d 233 (1969).[24] However, state courts entertaining the admission of evidence obtained in violations of federal standards by federal and nonforum state officials; and federal courts considering the admission of evidence obtained in violations of federal law by state officials *must* apply the federal exclusionary device, and may not disregard the illegality of the evidence even though it were obtained in another jurisdiction. *Mapp v. Ohio*, 367 U.S. 643, 657–60, 81 S.Ct. 1684, 1692–94, 6 L.Ed.2d 1081 (1961); *Elkins v. United States*, 364 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960).

■ The present issue involves consideration of the admissibility in a federal forum of evidence obtained by federal officials allegedly in violation of federal law. The bifurcated approach permitting courts in certain circumstances to disregard the nonforum illegality of certain evidence is thus inapplicable here.[25] Evidence illegally obtained within the First Circuit, and inadmissable there, must also be inadmissable here regardless of whether this circuit has a less restrictive exclusionary remedy. Any contrary position would seriously jeopardize the integrity of the federal courts, and would in fact amount to a subterfuge

---

**23.** Under limited circumstances, federal courts do look to state law to determine the admissibility of wiretap evidence. *United States v. Vazquez*, 605 F.2d 1269, 1276–77 (2d Cir.1979), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *United States v. Sotomayor*, 592 F.2d 1219, 1223 (2d Cir.1979), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979); *United States v. Manfredi*, 488 F.2d 588, 592 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). Thus, the defendants' recitation of the rule that questions of admissibility are always governed by the law of the forum is not a complete statement of the law in this circuit, and is, in fact, highly misleading. *See United States v. Aiello*, 771 F.2d 621, 627 (2d Cir.1985) ("we will apply more stringent state statutory requirements with respect to wiretap authorizations that are designed to protect an individual's right of privacy"). *See also* note 20, *supra*.

**24.** There are several exceptions. *See* note 23, *supra*. *See also* note 20, *supra*.

**25.** *See* note 20, *supra*.

in violation of undeniable statutory and constitutional values.[26] Conversely, tainted evidence obtained within the First Circuit but nonetheless admissible there should also be admissible here regardless of whether this circuit has a more stringent exclusionary device. Applying the principles that form the foundation of the Court's lex loci approach, the Court finds that there is no logical basis for the conclusion that the forum should reward or punish the Government with either a more lenient or a more severe penalty than that proclaimed by the courts of the jurisdiction where the conduct occurred.[27] Accordingly, the Court adopts the following rule: Title III evidence gathered under the supervisory authority of First Circuit courts and admissible in that jurisdiction is also admissible here; Title III evidence gathered within the First Circuit but inadmissible there is correspondingly inadmissible in this forum.[28]

### Conclusion

For the foregoing reasons, the Court adheres to its finding that the law of the First Circuit governs with regard to the defendants' motions concerning the legality of the Government's electronic surveillance operations conducted in Massachusetts and Puerto Rico. The Court also finds that questions of admissibility are to be governed according to the same law.

SO ORDERED.

---

**26.** *See e.g.* note 11, *supra.*

**27.** There remain two other paradigmatic situations: 1) where the evidence was legally obtained in the First Circuit and would be admissible there; and 2) where the evidence was legally obtained, but for some reason would be inadmissible under nonforum federal law. The first paradigm, of course, is a matter of regular occurrence. The second is purely hypothetical as it relates to Title III.

**28.** For a variety of reasons central to the Court's analysis, it would be anomalous to apply a rule that would allow evidence to be admitted in the federal forum but not in the federal jurisdiction where it was obtained; or conversely, for the forum to deny the admission of evidence admissible in the jurisdiction where it was seized. *See e.g.* notes 4–14, *supra,* and accompanying text.