925 P.2d 357

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Fred Douglas BRIDGES, also known as Fred, Defendant–Appellee,**

and

**Timothy Lamar Bradley, also known as Tim, Defendant.**

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Timothy Lamar BRADLEY, also known as Tim, Defendant–Appellee,**

and

**Fred Douglas Bridges, also known as Fred, Defendant (Two Cases).**

**Nos. 16800, 16752 and 16799.**

Supreme Court of Hawai'i.

Oct. 7, 1996.

James S. Choi, Deputy Prosecuting Attorney, Honolulu, for plaintiff-appellant.

Alexandra P. Scanlan, Deputy Public Defender, Honolulu, for defendant-appellee Fred Douglas Bridges.

`Nelson W.S. Goo, Honolulu, for defendant-appellee Timothy Lamar Bradley.

Before KLEIN, Acting C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and CRANDALL, Circuit Judge, in place of MOON, C.J., recused.

KLEIN, Justice.

We have consolidated the appeals of Defendants–Appellees Fred Douglas Bridges and Timothy Lamar Bradley.[1] Bridges and Bradley were indicted on charges of Promoting a Dangerous Drug in the First Degree (the promoting charge) and Criminal Conspiracy (to commit the offenses of Promoting a Dangerous Drug in the First Degree and Commercial Promotion of Marijuana in the Second Degree) (the conspiracy charge). Prior to trial, Bradley filed a motion to suppress evidence and a motion to dismiss for lack of jurisdiction. Bridges subsequently joined in both motions.

The circuit court granted both appellees' motions to suppress evidence, granted Bradley's motion to dismiss as to both counts of the indictment, granted Bridges's motion to dismiss as to the promoting charge, and denied Bridges's motion to dismiss as to the conspiracy charge. The State of Hawai'i (the prosecution) appeals the granting of both appellees' motions to suppress evidence and the granting of Bradley's motion to dismiss as to the conspiracy charge. For the reasons set forth below, we reverse the order dismissing the conspiracy charge against Bradley, reverse the orders granting the appellees' motions to suppress evidence, and remand for further proceedings.

## I. BACKGROUND

In November 1989, a Honolulu Police Department (HPD) narcotics team led by Detective David Brown and Officer Emilio Laganse, following a tip from a confidential informant, met with the appellees in an undercover capacity to arrange a drug transaction that would involve heroin, cocaine, and/or marijuana. This initial meeting took place in the State of California, where both appellees resided. Between December 1989 and February 1990, the HPD agents made numerous telephone calls to the appellees in California regarding the transaction.

During one such conversation with Bradley on January 3, 1990, Bradley indicated that he

1. By order dated March 30, 1993, this court consolidated Nos. 16752 and 16799 with No. 16800.

wanted to continue the conversation from a different phone. The HPD agents told Bradley that he could call them back collect. Shortly thereafter, Bradley made a collect call from California to Hawai'i to resume the conversation regarding the drug transaction. Bradley made no other calls to Hawai'i and never set foot in Hawai'i during the time period that the conspiracy allegedly took place.

In February 1990, the HPD paid for Bridges to fly to Honolulu to meet the ostensible heroin source[2] and to further discuss the proposed drug transaction with Detective Brown and Officer Laganse. During Bridges's visit, the HPD agents agreed to provide heroin, marijuana, and cash to the appellees in exchange for cocaine. In addition, the HPD agents made a pre-payment of $1,000 for the cocaine that was to be later provided by the appellees. Finally, the HPD agents and Bridges agreed that the physical exchange of drugs would take place in California.

The HPD subsequently contacted the La Habra Police Department and the Los Angeles Police Department to coordinate a "sting" operation. As part of the "sting," Detective Brown and Officer Laganse invited the appellees to Room 236 of the La Habra Best Western Inn on February 27, 1990, to complete the transaction. In preparation for the meeting, Laganse was fitted with a Nagra[3] recording device to record the conversations of the parties within Room 236. In addition, unbeknownst to either Bridges or Bradley, and without their consent, audio and audio-video monitoring equipment was installed in Room 236 by HPD agents.

Before installing the monitoring equipment, the HPD agents had asked the La Habra police to obtain an order from a California court authorizing the installation of the equipment. Detective Brown testified concerning the court order as follows:

Because we weren't familiar with California law, we told them what we wanted to do and asked them their advice, because we didn't know if it was legal within the State of California. They informed us that they did not need a Court Order in the State of California to install video equipment.

So I asked them if they would be willing to get a Court Order so we don't—we don't have any problems with the future in regards to installing an illegal video, or audio installation.

Although Detective Brown testified that the La Habra police in fact procured such an order, no court order was admitted into evidence.[4]

When the appellees met with the HPD agents in Room 236, Detective Brown gave the appellees one pound of heroin and two pounds of marijuana in exchange for 10.6 grams of cocaine and a promise that more would be provided later. As arranged, the La Habra police thereafter stopped the appellees' vehicle in the Best Western parking lot and arrested the appellees.

The following items were obtained by either the HPD agents or the La Habra police after the appellees were arrested: the marijuana, heroin, and cocaine involved in the transaction; an audio recording from the Nagra worn by Officer Laganse; an audio-video recording of the transaction; audio-video recordings of statements made by the appellees to the La Habra police after they were arrested; miscellaneous items recovered from the appellees when they were booked; and miscellaneous items recovered from a search of the appellees' vehicle.

On October 22, 1991, an indictment was filed charging Bridges and Bradley with one count each of Promoting a Dangerous Drug in the First Degree, and one count each of Criminal Conspiracy (to commit the offenses of Promoting a Dangerous Drug in the First Degree and Commercial Promotion of Mari-

---

2. Officer Carlton Nishimura posed as the heroin supplier during Bridges's visit to Honolulu.

3. A "Nagra" is a brand of body tape recorder that records face-to-face conversations. *See State v. Okubo*, 67 Haw. 197, 198, 682 P.2d 79, 80 (1984).

4. The prosecution offered a document that was purportedly a copy of the California court order, but because it was not properly authenticated at the hearing, the circuit court did not admit it into evidence.

juana in the Second Degree). The appellees were subsequently extradited from California to Hawai'i. On August 20, 1992, Bradley filed a motion to dismiss the indictment for lack of jurisdiction and a motion to suppress evidence. On October 19, 1992, Bridges filed notices of joinder in both of Bradley's motions.

Following a hearing, the circuit court entered orders granting Bradley's motion to dismiss the indictment, granting Bradley's motion to suppress, granting in part (as to the promoting charge) and denying in part (as to the conspiracy charge) Bridges's motion to dismiss the indictment, and granting Bridges's motion to suppress.

Pursuant to Hawai'i Revised Statutes (HRS) § 641–13 (1993), the prosecution now appeals the orders granting the appellees' motions to suppress and the portion of the order granting Bradley's motion to dismiss as it applies to the conspiracy charge; the prosecution does not challenge the dismissal of the promoting charges against either appellee.

## II. *DISCUSSION*

### A. *Jurisdiction over Bradley*

In the instant case, the prosecution has charged the appellees with conspiracy based in large part upon conduct occurring outside the boundaries of our state. HRS § 701–106 (1993), which "delineates the scope of Hawai'i's criminal jurisdiction," *State v. Meyers,* 72 Haw. 591, 595, 825 P.2d 1062, 1064 (1992), specifically addresses two types of conspiracy charges, stating in pertinent part:

**Territorial applicability.** (1) Except as otherwise provided in this section, a person may be convicted under the law of this State of an offense committed by the person's own conduct or the conduct of anoth-

er for which the person is legally accountable if:

. . . .

(c) Conduct occurring outside the State is sufficient under the law of this State to constitute a conspiracy to commit an offense within the State and an overt act in furtherance of such conspiracy occurs within the State; or

(d) Conduct occurring within the State establishes . . . [a] conspiracy to commit[ ] an offense in another jurisdiction which also is an offense under the law of this State[.]

In order to determine which subsection applies to the instant case, we must examine the nature of the conspiracy alleged in the indictment. The conspiracy count of the indictment states in pertinent part:

On or about the 19th day of November, 1989 to and including the 27th day of February, 1990, in the City and County of Honolulu, State of Hawaii[,] FRED DOUGLAS BRIDGES . . . and TIMOTHY LAMAR BRADLEY, . . . with the intent to promote or facilitate the commission of crimes, to wit, Promoting a Dangerous Drug in the First Degree and Commercial Promotion of Marijuana in the Second Degree, did enter into a conspiracy . . . by agreeing with each other and with [Detective Brown and Officers Laganse and Nishimura], and persons unknown, . . . that they or one or more of them would engage in or solicit the conduct or would cause or solicit the result specified by the definitions of Promoting a Dangerous Drug in the First Degree and Commercial Promotion of Marijuana in the Second Degree in Sections 712–1241(1)(b)(ii)(A) [5] and 712–1249.5(1)(b) [6] of the Hawaii Revised Statutes.

(A) One-eighth ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

6. HRS § 712–1249.5(1)(b) (1993) provides:

**Commercial promotion of marijuana in the second degree.** (1) A person commits the offense of commercial promotion of marijuana in the second degree if the person knowingly:

. . . .

5. HRS § 712–1241(1)(b)(ii)(A) (1993) provides:

**Promoting a dangerous drug in the first degree.** (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:

. . . .

(b) Distributes:

. . . .

(ii) One or more preparations, compounds, mixtures, or substances of an aggregate weight of:

It was part of said conspiracy that Defendants BRIDGES and BRADLEY would knowingly distribute one or more preparations, compounds, mixtures, or substances of an aggregate weight of one-eighth ounce or more containing heroin or salts, isomers, and salts of isomers of heroin and marijuana having an aggregate weight of one pound or more to and with unindicted co-conspirators Brown, Laganse, Nishimura, and persons unknown.

In addition, the indictment alleges eighteen separate overt acts that were allegedly committed "[i]n furtherance of the conspiracy and to effect the objects thereof."

Based on the language of the indictment and the evidence presented at the hearing on the appellees' motions to dismiss and to suppress evidence, it is clear that the conspiracy charges against the appellees allege that they conspired with each other and/or the HPD agents to distribute heroin and marijuana. *See also* Memorandum In Opposition To Motion To Dismiss Indictment For Lack Of Jurisdiction, at 5 ("In the instant case both Defendants have been charged with conspiracy to distribute heroin and marijuana (Count II) during the time period from November 19, 1989 to and including February 27, 1990. The purpose or plan of the conspiracy was to distribute heroin and marijuana.").

■ Although not argued by the appellees, we note that the appellees' receipt of heroin and marijuana from the HPD agents could not have amounted to distribution of heroin and marijuana. In *State v. Aluli,* 78 Hawai'i 317, 893 P.2d 168 (1995), this court held that " 'to distribute,' as that term is defined in HRS § 712–1240, does not include 'to buy' or 'to offer to buy.' " 78 Hawai'i at 323, 893 P.2d at 174. In reaching our decision, we recognized that HRS § 712–1240 (1993) de-

(b) Distributes marijuana having an aggregate weight of one pound or more[.]

7. In *Aluli,* we stated that an "exchange" of dangerous drugs "plainly requires that the actor provide a dangerous drug to another in return for which he/she receives some equivalent dangerous drug. For example, a person would 'exchange a dangerous drug with another' by giving cocaine and receiving heroin in return." 78 Hawai'i at 321, 893 P.2d at 172. In light of our further determination that the legislature intend-

fines "to distribute," *inter alia,* as "to ... exchange with another," and expressly considered that aspect of the definition of "to distribute." We explained that

all of the other words the legislature used to define "to distribute" (sell, transfer, prescribe, give, deliver, etc.) clearly indicate that the legislature intended to proscribe the supplying or providing of dangerous drugs "*to* another." It would be incongruous, then, to construe the legislature's use of "exchange with another" as indicating its intention to proscribe the purchase or receipt of drugs *from* another.

*Aluli,* 78 Hawai'i at 321, 893 P.2d at 172 (citation omitted; emphasis in original).[7] Accordingly, the appellees' receipt of heroin and marijuana from the HPD agents as part of an exchange of drugs could not constitute distribution of those drugs under HRS § 712–1240. *Cf. State v. Rullman,* 78 Hawai'i 488, 491, 896 P.2d 944, 947 (App.1995) ("To sell a drug is to transfer it to another for any kind of consideration. To barter a drug is to transfer it to another for a kind of consideration other than money. Thus, bartering a drug is a type of sale; exchanging is similar.")

■ Moreover, although the HPD agents clearly distributed heroin and marijuana to the appellees, *see supra* note 7, the appellees' agreement merely to receive the heroin and marijuana that was distributed by the HPD agents could not constitute an agreement to distribute heroin and marijuana. As explained in *State v. Senteno,* 69 Haw. 363, 742 P.2d 369 (1987), an agreement between providers and recipients of drugs is not the equivalent of an agreement between co-conspirators: "The terms 'offer or agree' contained in HRS § 712–1240 defining 'to distribute' refer to offers or agreements made with respect to prospective *buyers.* In con-

ed to proscribe "the supplying or providing of dangerous drugs to another" and not "the purchase or receipt of drugs from another," *id.* (quotation marks and emphasis omitted), it is evident that in the example given, the person "giving cocaine and receiving heroin in return" would be distributing cocaine but not distributing heroin while the other person involved in the exchange would be distributing heroin but not distributing cocaine.

trast, the conspiracy statute (HRS § 705–520) speaks in terms of agreements among *co-conspirators.*" 69 Haw. at 367, 742 P.2d at 372 (emphases in original). Thus, any agreement by the appellees merely to receive heroin and marijuana from the HPD agents who were distributing the drugs could not constitute an agreement between co-conspirators to distribute heroin and marijuana.[8]

 On the other hand, the indictment can legitimately be construed as charging the appellees with conspiring with each other and/or the HPD agents to distribute heroin and marijuana to other unidentified persons on the mainland. The overt acts alleged in the indictment contain express references to further distribution of the drugs:

4. On February 6, 1990, an informant, Brown, and Laganse met with Defendant BRIDGES in California and discussed, among other things, the following: heroin and marijuana being delivered to the Defendant Bridges; *Defendant BRIDGES' sending of heroin to Texas and Indianapolis for distribution;* prices, quantities, and purity of heroin; Brown giving Defendant BRIDGES two pounds of marijuana as a sample; and future phone calls.

. . . .

6. On February 17, 1990, Defendant BRIDGES met with Nishimura, Brown, and Laganse in Honolulu and discussed the price of heroin, *distribution of heroin in various mainland cities,* quantities of heroin to be delivered, and arrangements for the upcoming marijuana, heroin, and cocaine deal.

(Emphasis added.) In addition, the amount of heroin (one pound) and marijuana (two pounds) involved is sufficient to support an inference that further distribution of the drugs was contemplated by the appellees. Thus, the question becomes whether the circuit court had jurisdiction over Bradley with respect to the charge that he conspired with Bridges and/or the HPD agents to distribute heroin and marijuana to unidentified persons on the mainland.

HRS § 701–106(1)(c) only applies to "conspirac[ies] to commit an offense within the State." A conspiracy to distribute drugs on the mainland is not a conspiracy to commit an offense within Hawaiʻi. Therefore, HRS § 701–106(1)(c) does not apply.

HRS § 701–106(1)(d), on the other hand, applies to "conspirac[ies] to commit an offense in another jurisdiction." This is the applicable subsection to determine whether the circuit court had jurisdiction over Bradley. Under this subsection, jurisdiction exists when "[c]onduct occurring within [Hawaiʻi] establishes" the conspiracy. HRS § 705–520 (1993) sets forth the conduct elements of a criminal conspiracy as follows:

**Criminal conspiracy.** A person is guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a crime:

(1) He [or she] agrees with one or more persons that they or one or more of them will engage in or solicit the conduct or will cause or solicit the result specified by the definition of the offense; and

(2) He [or she] or another person with whom he [or she] conspired commits an overt act in pursuance of the conspiracy.

Thus, in order for jurisdiction over Bradley to exist under HRS § 701–106(1)(d), an agreement (by Bradley) and an overt act in pursuance of the conspiracy (committed by Bradley "or another person with whom he conspired") must have occurred in Hawaiʻi. *See State v. Merino,* 81 Hawaiʻi 198, 213, 915 P.2d 672, 687 (1996).

---

8. To hold otherwise would allow the prosecution to charge any person who agrees to receive drugs with conspiring to distribute those drugs. Because a "conspiracy to commit a crime is an offense of the same class and grade as the most serious offense which is an object of the conspiracy," (except that "[a] conspiracy to commit a class A felony is a class B felony"), HRS § 705–526 (1993), allowing the prosecution to charge drug recipients with conspiring to distribute those drugs would, in many cases, defeat the legislative intent with respect to the different grades of offenses applicable to drug distributors and drug possessors. *See Aluli,* 78 Hawaiʻi at 321–22, 893 P.2d at 172–73 (discussing the intended distinction between drug suppliers/distributors and possessors/recipients).

## 1. *Agreement*

There is nothing in the record to indicate when or where Bradley initially agreed with Bridges and/or the HPD agents that one or more of them would distribute the heroin and marijuana on the mainland. However, if Bradley committed an overt act in Hawai'i, that overt act would serve to "renew" his agreement in Hawai'i. *See People v. Pascarella*, 92 Ill.App.3d 413, 48 Ill.Dec. 1, 5, 415 N.E.2d 1285, 1289 (1981) ("It is long established that every act in furtherance of a conspiracy is regarded, in law, as a renewal or continuance of the unlawful agreement. The conspiracy is renewed ... at the place where the overt act is done.").[9]

Although Bradley was never physically in Hawai'i, he did place a telephone call that was received in Hawai'i. According to *State v. Meyers*, 72 Haw. 591, 595, 825 P.2d 1062, 1064–65 (1992), "a telephone call constitutes conduct in the jurisdiction in which the call is received." The telephone conversation concerned the heroin and marijuana dealing. Thus, the telephone call constituted an overt act in furtherance of the conspiracy that was "committed" in Hawai'i, thereby "renewing" Bradley's conspiratorial agreement in Hawai'i.

## 2. *Overt Act*

As discussed above, in order for jurisdiction to lie under HRS § 701–106(1)(d), both an agreement and the commission of an overt act must have occurred in Hawai'i. More-

over, although an overt act may serve to "renew" the agreement, the commission of a single overt act in Hawai'i cannot establish jurisdiction under HRS § 701–106(1)(d). *See supra* note 9. Thus, although Bradley's telephone call to the HPD agents in Hawai'i constituted an overt act in Hawai'i, because that overt act was used to establish the agreement, a separate overt act must have been committed in Hawai'i in order for jurisdiction to exist under HRS § 701–106(1)(d).

Aside from the one collect call made to the HPD agents, Bradley placed no other telephone calls that were received in Hawai'i and, as noted above, he never set foot in Hawai'i during the time period that the conspiracy allegedly took place. Thus, as far as the record reveals, Bradley did not personally commit a second overt act in Hawai'i.

HRS § 701–106(1)(d), however, does not require that the defendant personally commit an overt act in Hawai'i; it only requires that conduct establishing the conspiracy occur in Hawai'i. Moreover, pursuant to HRS § 701–106(1), criminal jurisdiction can be based on the defendant's "own conduct or the conduct of another for which the person is legally accountable," and, under HRS § 705–520, a person is guilty of criminal conspiracy if "[h]e [or she] or another person with whom he [or she] conspired commits an overt act in pursuance of the conspiracy." Thus, an overt act committed in Hawai'i by a person with whom Bradley conspired would suffice to establish

---

**9.** This is not to say that, without more, jurisdiction lies under HRS § 701–106(1)(d) simply by virtue of the commission in Hawai'i of a single overt act. HRS § 701–106(1)(c) provides that jurisdiction may be premised solely on the commission of "an overt act in furtherance of [the] conspiracy ... within the State." HRS § 701–106(1)(d), on the other hand, requires the commission of "[c]onduct ... within the State establish[ing the] conspiracy." In light of the broader language used in subsection (d), the commission of a single overt act in Hawai'i cannot be used to satisfy the requirements of that subsection.

Interpreting subsection (d) to require the commission of more conduct in Hawai'i ·than required under subsection (c) before the state may assert criminal jurisdiction comports with the interests of the state implicated under the respective subsections. Subsection (c) concerns conspiracies whose underlying offenses would occur in Hawai'i. Hawai'i has a very strong interest in

preventing the commission of crimes within its boundaries and penalizing those who would conspire to commit crimes here. Hence, we require minimal contact with the state before asserting criminal jurisdiction over such conspirators.

Subsection (d), on the other hand, concerns conspiracies whose underlying offenses would occur in other states. Hawai'i has much less interest in preventing or penalizing the commission of crimes in other states. We recognize, however, that a "conspiracy 'involves a distinct danger in addition to that involved in the actual commission of any specific offense.' " *State v. Okumura*, 78 Hawai'i 383, 410, 894 P.2d 80, 107 .(1995) (quoting *State v. Hackett*, 7 Haw.App. 526, 530, 783 P.2d 1232, 1235, *cert. denied*, 71 Haw. 668, 833 P.2d 901 (1989)). Therefore, if all the elements establishing a criminal conspiracy take place in Hawai'i, our courts may assert criminal jurisdiction.

the overt act required for jurisdiction under HRS § 701–106(1)(d).

The evidence in the record clearly demonstrates that Bridges was a person with whom Bradley had conspired and that Bridges committed at least one overt act in furtherance of the conspiracy in Hawai'i when, while in Honolulu, he met with the undercover agents, discussed the drug transaction, and accepted a pre-payment for the cocaine.

Therefore, the circuit court had jurisdiction over Bradley on the charge that he conspired with Bridges and/or the HPD agents to distribute heroin and marijuana to unidentified persons on the mainland. Accordingly, we hold that the circuit court erred in granting Bradley's motion to dismiss with respect to the conspiracy charge.

### B. *The suppression issue*

■ The audio/videotaping that was conducted in California by the HPD agents, in conjunction with the La Habra police, apparently violated neither the United States Constitution nor any California law.[10] The circuit court, however, concluded that the audio/videotaping violated HRS § 803–42 and, therefore, granted appellees' motions to suppress.

The prosecution argues that the circuit court's orders granting the appellees' motions to suppress must be vacated because either (1) the full faith and credit clause of the United States Constitution required the circuit court to admit the evidence, (2) the circuit court erroneously concluded that Hawai'i law governed the audio/videotaping that took place in California, or (3) even assuming that Hawai'i law governed the audio/videotaping, the search did not violate any Hawai'i law.

We agree with the prosecution that, even if the audio/videotaping would have violated HRS § 803–42 or article I, section 7 of the Hawai'i Constitution if it had been conducted in Hawai'i, because the audio/videotaping was conducted in California in apparent compli-

ance with the United States Constitution and California law, *see supra* note 10, the circuit court erred in suppressing the evidence. Consequently, we need not decide whether the full faith and credit clause of the United States Constitution required admission of the evidence or whether the audio/videotaping would have violated HRS § 803–42 or article I, section 7 of the Hawai'i Constitution if it had been conducted in Hawai'i.

The issue presented in this case—under what circumstances will evidence obtained in one state (the situs state) be suppressed in a criminal prosecution in another state (the forum state)—is novel to this jurisdiction. The issue, however, has been addressed by courts in other jurisdictions, with varying results. *See, e.g., Pooley v. State,* 705 P.2d 1293 (Alaska.Ct.App.1985); *People v. Mattson,* 37 Cal.3d 85, 207 Cal.Rptr. 278, 688 P.2d 887 (1984); *People v. Blair,* 25 Cal.3d 640, 159 Cal.Rptr. 818, 602 P.2d 738 (1979); *People v. Orlosky,* 40 Cal.App.3d 935, 115 Cal. Rptr. 598 (1974); *People v. Porter,* 742 P.2d 922 (Colo.1987); *People v. Saiken,* 49 Ill.2d 504, 275 N.E.2d 381 (1971); *State v. Gallegos,* 255 Kan. 382, 874 P.2d 647 (1994); *State v. Lucas,* 372 N.W.2d 731 (Minn.1985); *State v. Davis,* 313 Or. 246, 834 P.2d 1008 (1992); *Burge v. State,* 443 S.W.2d 720 (Tex.Crim. App.1969); *see also United States v. Gerena,* 667 F.Supp. 911 (D.Conn.1987); *State v. Minter,* 116 N.J. 269, 561 A.2d 570 (1989). In addition, the issue has been discussed by legal commentators. *See, e.g.,* 1 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 1.5(c) (3d ed. 1996); J. Corr, "Criminal Procedure and the Conflict of Laws," 73 Geo.L.J. 1217 (1985); M. Morrison, "Choice of Law for Unlawful Searches," 41 Okla.L.Rev. 579 (1988); W. Theis, "Choice of Law and the Administration of the Exclusionary Rule in Criminal Cases," 44 Tenn.L.Rev. 1043 (1977); Tullis & Ludlow, "Admissibility of Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary Rule," 10 U.S.F.L.Rev. 67 (1975); *see also* B. Latzer, "The New Judicial Federalism and Criminal Justice: Two Prob-

10. Neither appellee has contended on appeal that the audio or videotaping violated the United States Constitution, the California Constitution, or any other California law. Therefore, we assume, without deciding, that the audio and videotaping was conducted in conformity with all of those laws.

lems and a Response," 22 Rutgers L.J. 863, 869–84 (1991); G. Neuman, "Conflict of Constitutions? No Thanks: A Response to Professors Brilmayer and Kreimer," 91 Mich. L.Rev. 939, 944–50 (1993); T. Quigley, "Do Silver Platters Have a Place in State–Federal Relations? Using Illegally Obtained Evidence in Criminal Prosecutions," 20 Ariz.St. L.J. 285, 321–25 (1988).

The issue has generally been addressed as a type of conflict of laws question.[11] "Conflicts assessments in criminal law have occurred most frequently in cases ... where the court is considering the applicability of an exclusionary rule to evidence obtained through a police search or interrogation of a suspect." Corr, *supra*, at 1220 (footnote omitted). These "[c]onflict situations have been analyzed in two ways: conflicts of law analysis and an exclusionary rule analysis." Quigley, *supra*, at 321–22 (footnotes omitted).

Under a conflicts of law approach, "courts analyze the issue as if it were a civil case and apply the choice of law method of the forum state to determine whether the law of the forum state or the situs state should be followed, and what sanctions are to be used if the appropriate law is violated." *Porter*, 742 P.2d at 925. "The dominant conflicts of law theory is interest analysis, which determines the appropriate law by considering the domicile of the parties, the situs of the transactions, and the interest of the forum in applying its own law." Latzer, *supra*, at 873.

On the other hand, "[u]nder an exclusionary rule analysis the court first identifies the principles to be served by the exclusionary rule, and then evaluates how the principles would be served by exclusion." Quigley, *supra*, at 322 (footnote omitted).

"Although the cases are fairly rare, the trend appears to be toward using the exclusionary rule analysis." *Id.* (footnote omit-

ted). "Both courts and commentators have concluded that it is preferable to use an exclusionary rule analysis rather than the traditional conflicts of law approach to determine the admissibility of evidence in the forum state which is obtained in another jurisdiction." *Porter*, 742 P.2d at 925. *See, e.g.*, LaFave, *supra*, at 151–52; Latzer, *supra*, at 875 (stating that the exclusionary rule analysis "appears better suited to criminal cases than conflicts of law theories"); *Minter*, 561 A.2d at 576 ("The better approach, we think, is the exclusionary-rule analysis[.]"); *Porter*, 742 P.2d at 925 ("We agree that ... an exclusionary rule analysis should be followed."); *Lucas*, 372 N.W.2d at 736–37; *Mattson*, 207 Cal.Rptr. at 282, 688 P.2d at 891; *Blair*, 159 Cal.Rptr. at 827–28, 602 P.2d at 747–48; Tullis & Ludlow, *supra*, at 88–91. Because the exclusionary rule analysis focusses specifically on the issues pertaining to conflicts issues in interstate search and seizure cases, we agree that it is the better approach.

The first step in an exclusionary rule analysis is to identify the principles underlying the exclusionary rule. In Hawai‘i, we have recognized a number of purposes underlying our exclusionary rule: (1) judicial integrity, *State v. Pattioay*, 78 Hawai‘i 455, 468, 896 P.2d 911, 924 (1995) ("to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts"); (2) individual privacy, *State v. Lopez*, 78 Hawai‘i 433, 446, 896 P.2d 889, 902 (1995) ("to protect the privacy rights of our citizens" (emphasis omitted)); and, of course, (3) deterrence, *Pattioay*, 78 Hawai‘i at 468, 896 P.2d at 924 ("to deter illegal police conduct").

We next consider whether application of the exclusionary rule in this case would sufficiently advance these purposes so as to justify the suppression of the reliable,[12] probative

---

**11.** However,

[m]ost of the prominent conflict-of-laws treatises do not even mention criminal matters. Professor Leflar is one of the very few conflicts scholars to accord any attention to criminal law, and his one-volume treatise disposes of the area in a short chapter. Leflar explains that no further attention is warranted because in criminal matters the forum will always ap-

ply its own law. R. Leflar, *American Conflicts Law* § 111, at 223–25 (3d ed. 1977).

Corr, *supra*, at 1217 n. 1.

**12.** Of course, if the means by which evidence was obtained draws into question the reliability of that evidence, the evidence should be suppressed regardless of where or by whom it was obtained. Professor Theis explains thusly:

evidence that was obtained by the HPD agents.

### 1. *Judicial Integrity*

The "judicial integrity" purpose of the exclusionary rule is essentially that the courts should not place their imprimatur on evidence that was illegally obtained by allowing it to be admitted into evidence in a criminal prosecution. Of course, when evidence is not obtained illegally, "no loss of judicial integrity is implicated in a decision to admit the evidence." *Minter*, 561 A.2d at 571. Thus, the question becomes whether the evidence was obtained illegally in the first instance.

As a general rule, the question of whether given conduct is legal is answered by looking to the laws of the jurisdiction in which that conduct was performed, i.e., the situs state. *See Gerena*, 667 F.Supp. at 919 ("[T]he states generally determine the legality of alleged police conduct through application of the law of the place where the conduct occurred."); *Menefee v. State*, 640 P.2d 1381, 1384 (Okla. Crim.App.1982) ("[T]he validity of the appellants' warrantless arrests, and the ensuing search and seizure are governed by the laws of the [situs state]."); *State v. Cooper*, 223 Kan. 175, 573 P.2d 1006, 1008 (1977) ("As in arrest we look to the state of search and seizure to determine validity."); *Theis, su-*

*pra*, at 1045 ("The courts have had little difficulty in determining that the law of the jurisdiction wherein the conduct took place determines the legality of the conduct."); *see also Blair*, 159 Cal.Rptr. at 827–28, 602 P.2d at 747–48; LaFave, *supra*, at 149.

In the instant case, the evidence was apparently obtained in compliance with the laws of the state of California. *See supra* note 10. Thus, under the general rule, admitting the evidence obtained in California would not cause a loss of judicial integrity.[13]

Our analysis of judicial integrity is not complete, however, because the question "whether the [forum state] constitution [or laws] limits the powers of state officials even when they act extraterritorially," Neuman, *supra*, at 945, must be addressed. *See also* Latzer, *supra*, at 878 ("The applicability of state constitutional law, and hence the illegality, may turn on the identity of the agents' employer or the enforceability of the state constitution beyond the state boundaries. One cannot say that the search was legal or illegal without considering the applicability of the relevant state constitutions.").

Professor Theis has suggested that, in all cases, "[s]tate agents are ... bound ... by state law when they operate outside their

The forum has an interest not only in effectively prosecuting criminal activity, but also in basing any conviction on reliable, trustworthy evidence, a consideration discounted in search and seizure cases. On this goal all jurisdictions agree in principle; not even the most totalitarian regime admits to basing conviction on anything other than reliable evidence, although different jurisdictions may have different views of the appropriate means for attaining the common goal. Accordingly, the cases are clear that the forum will exclude evidence it considers untrustworthy even though the evidence may have been legally obtained under foreign law.

Theis, *supra*, at 1050 (footnotes omitted). Similarly, "[i]f agents in another jurisdiction obtain evidence by engaging in conduct shocking to the conscience of the court, the evidence will probably be excluded." *Id.* at 1051 n. 24 (citations omitted).

In the instant case, nothing about the manner in which the evidence was obtained draws into question the reliability of that evidence or shocks the conscience of the court.

**13.** We note that, under the analysis set forth above, when evidence is obtained in violation of

the laws of the situs state, admitting that evidence in a criminal proceeding in the forum state would adversely impact judicial integrity. *But see Orlosky*, 115 Cal.Rptr. at 601 (reasoning that even if seizure was illegal under the law of the situs state, because the police conduct would have been proper under the law of the forum state, the judicial integrity (or "dirty business") rationale allowed for the admission of the evidence). Furthermore, the decision to admit or exclude evidence obtained in violation of the laws of the situs state might implicate the full faith and credit clause of the United States Constitution. *See* Corr, *supra*, at 1223–28 (arguing that the full faith and credit clause might require a forum court to suppress evidence that was obtained in violation of situs law); *cf.* Morrison, *supra*, at 597–605 (discussing the applicability of the full faith and credit clause to these situations). In the instant case, however, because the evidence at issue was apparently obtained in compliance with California law, we need not decide whether our exclusionary rule would require suppression of evidence that is obtained in violation of situs law.

state." Theis, *supra*, at 1049. We agree that whether agents of the forum state participated in a search or seizure in the situs state is a relevant consideration in determining whether the exclusionary rule mandates suppression of any evidence so obtained. *See infra* § II.B.3 (discussing forum state agents' participation in the context of the deterrent purpose of the exclusionary rule). In addition, there is no doubt that every state has the authority to proscribe the conduct of its agents when they act in their official capacity, even when the agents act in another state. However, we note that according to HRS § 1–4 ("Persons and property subject to laws"), "[t]he laws are obligatory upon all persons and property within the jurisdiction of the State." It follows that persons and property not within the jurisdiction of Hawai'i are generally not subject to the laws of Hawai'i. Thus, unless there is some Hawai'i law that has been made explicitly applicable to the conduct of agents of the state of Hawai'i when acting outside of the state, we do not believe that the laws of Hawai'i should be considered in deciding the question of whether the evidence was illegally obtained.

■ In this context, we first consider whether the Hawai'i statutes relating to electronic eavesdropping, HRS ch. 803, part IV, were intended to have extraterritorial effect. Our review of the language of HRS chapter 803, part IV, and its legislative history, has revealed no indication that the statutes were intended to have extraterritorial effect. Similarly, we have found nothing in the language or legislative history of article I, section 7 of the Hawai'i Constitution to suggest that it was intended to have extraterritorial effect. Therefore, we conclude that the provisions of HRS chapter 803, part IV, and article I, section 7 of the Hawai'i Constitution are not relevant to the question of the legality of the electronic eavesdropping activities that were conducted in La Habra, California.

Accordingly, because the evidence at issue was apparently obtained in compliance with California law and because no relevant Hawai'i law applies extraterritorially to the conduct of its agents, we conclude that admitting the evidence in the instant case would not tarnish the integrity of the courts.

2. *Individual Privacy*

As noted above, one of the primary purposes of our exclusionary rule is the protection of individual privacy. *See Lopez,* 78 Hawai'i at 446, 896 P.2d at 902. Among the cases that we cited in *Lopez* in support of our departure from the federal rationale of the exclusionary rule were two decisions of the Oregon Supreme Court, including *State v. Davis,* 313 Or. 246, 834 P.2d 1008 (1992).

In *Davis,* the Supreme Court of Oregon held:

This court has declared that evidence is suppressed for violations of the Oregon Constitution "to preserve * * * rights to the same extent as if the government's officers had stayed within the law." In the context of a criminal prosecution, the focus then is on protecting the individual's rights *vis-a-vis* the government, not on deterring or punishing the excessive conduct of any particular governmental actor, local or otherwise.

This focus on individual protection under the exclusionary rule, a rule that operates to vindicate a constitutional right in the courts, supports the constitutional rule that we announce here: If the government seeks to rely on evidence in an Oregon criminal prosecution, that evidence must have been obtained in a manner that comports with the protections given to the individual by Article I, section 9, of the Oregon Constitution. It does not matter *where* that evidence was obtained (in-state or out-of-state), or *what* governmental entity (local, state, federal, or out-of-state) obtained it; the constitutionally significant fact is that the Oregon government seeks to use the evidence in an Oregon criminal prosecution. Where that is true, the Oregon constitutional protections apply.

834 P.2d at 1012–13 (citations omitted) (emphases in original).

Although, like the Oregon Supreme Court, we have held that our exclusionary rule serves purposes beyond mere deterrence, we cannot agree that application of our exclusionary rule to evidence that was obtained in

a manner that would have violated Hawai'i law had it been obtained in Hawai'i, no matter where or by whom it was obtained, will—in all cases—serve "to protect the privacy rights of our citizens." *Lopez,* 78 Hawai'i at 446, 896 P.2d at 902 (emphasis omitted).

To begin with, the plain language that we employed in *Lopez* suggests that the individual privacy rationale would only apply to "citizens" of the state of Hawai'i. Interpreting the individual privacy rationale as applicable only to citizens of the state of Hawai'i would not be without support. For example, "[t]he *[United States v.] Verdugo–Urquidez* [, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990),[14]] approach ... suggests that the applicability of a state search and seizure provision should be a function of defendant's state citizenship." Latzer, *supra,* at 883 n. 54 (footnote added).

However, determining the applicability of our exclusionary rule based on the defendant's citizenship would raise federal constitutional concerns, particularly with respect to the Privileges and Immunities clause of the United States Constitution. Professor Corr explains thusly:

> [T]he privileges and immunities clause requires states to give their citizens and noncitizens the same protections. If [a forum state] suggests that it might protect [forum state] citizens from the consequences of a [situs state] search, but will not protect a citizen of [the situs state], it is discriminating on the basis of state citizenship in precisely the manner that the privileges and immunities clause prohibits.

Corr, *supra,* at 1233 (footnote omitted).

Not all commentators agree with Professor Corr's analysis. For example, Professor Morrison takes the following position:

> Clearly, there would be unconstitutional discrimination [under the privileges and immunities clause] if nonresidents searched in the forum were not afforded the same privacy rights as forum residents. Such a distinction between residents and nonresidents would not pass the low-level reasonable-relation test. What if,

however, the forum claimed forum residents have the benefits of the forum privacy right even when they are outside the forum, but nonresidents do not? ...

> The question essentially is whether the forum may divorce the forum privacy interest from some, but not all, physical or geographical contours. To effectuate this divorce, the forum's privacy theory would have to be bottomed in part on a subjective expectations-of-privacy theory. Surely, however, the forum reasonably could conclude, even without actual individual inquiry, that its residents carry some of these subjective expectations with them when they travel, but treat as self-serving and not credible nonresidents' claims to have had the same subjective expectations. In applying its evidence-suppressing rule for residents, but not for nonresidents, on situs searches, the forum then is *not* discriminating against nonresidents because of their nonresidency. It simply is objectivizing a portion of its subjective-expectations view by refusing to make actual inquiry in either case, and it is treating nonresidents as being vastly more likely to have formed their subjective expectations with reference to situs law than to forum law.

Morrison, *supra,* at 607–08 (footnotes omitted) (emphasis in original). *Cf. Blair,* 159 Cal.Rptr. at 828, 602 P.2d at 748 ("Defendant was a resident of the jurisdiction in which the seizure occurred. Since the search was legal there, his expectation of privacy was not impaired under the laws of the state in which he resided.").

We need not decide today which interpretation of the Privileges and Immunities clause is correct, however, because we do not believe that an individual's reasonable expectation of privacy from governmental intrusion is dependent on the individual's state citizenship. In this context, we agree with the following analysis set forth in *Gerena, supra:*

---

**14.** In *Verdugo–Urquidez,* the United States Supreme Court held that the fourth amendment to the United States Constitution does not apply to

searches of property owned by nonresident aliens that is located in a foreign country. 494 U.S. at 264, 110 S.Ct. at 1060.

In challenging the Government's surveillance observations, the defendants seek the preservation of their civil liberties and the vindication of their rights in the event of any violation. Within this context, the scope of the defendants' rights, as they might expect to exercise them on a day-to-day basis, is to be found within the realm of [the situs circuit] jurisprudence. Ordinarily, it would be the courts of that jurisdiction that would protect the defendants' interests and provide a civil remedy for any redressable wrong.... [A] defendant, in challenging the legality of any given electronic surveillance activity, would generally expect to look to the laws of the jurisdiction where the surveillance occurred to protect his or her privacy rights; and, in any event, any defendant can reasonably expect that the surveillance should be conducted in accordance with the laws of the jurisdiction of the supervising court.

667 F.Supp. at 917.[15]

In the instant case, the evidence at issue was apparently obtained in compliance with California law. *See supra* note 10. Thus, we conclude that admitting the evidence in this case would not offend the individual privacy rationale of our exclusionary rule.

### 3. Deterrence

The final rationale that we recognize for our exclusionary rule is deterrence. *See Pattioay,* 78 Hawai'i at 468, 896 P.2d at 924. "Deterrence" refers to our expectation that after evidence is suppressed based on particular police conduct in one case, in the future, police officers will refrain from that type of conduct and will instead act in a manner that would not lead to suppression of evidence. Professor Theis explains the deterrent mechanism of the exclusionary rule as follows: "The eventual failure of certain police practices to result in conviction of the guilty is thought to discourage employment of those practices. Frustrated by the exclusionary rule, police will follow only those practices considered legitimate." Theis, *supra,* at 1047.

Most authorities recognize that suppression of evidence in the forum state will have little, if any, deterrent effect on agents of the situs state conducting investigations within the situs state. *See, e.g.,* LaFave, *supra,* at 151 (noting that with respect to suppressing evidence obtained by "out-of-state violations by other police[, t]he prospect of deterrence is more remote"); Theis, *supra,* at 1048 ("A finding of illegality coupled with exclusion [in the forum state] would frustrate the forum's effective prosecution of accused criminals with little hope that investigative practices in foreign jurisdictions would change.").

The lack of any deterrent effect is particularly apparent when the manner in which the evidence was obtained did not violate situs law but would have violated forum law had the evidence been obtained in the forum state. *See, e.g., Blair,* 159 Cal.Rptr. at 828, 602 P.2d at 748 (reasoning that deterrence "would obviously not be served by exclusion of the evidence in question, for no [forum state] law enforcement personnel participated in the seizure of the [evidence] in [the situs state], and since the seizure was not illegal where it occurred, exclusion would serve no deterrent effect in either jurisdiction").[16]

15. Under this interpretation of the individual privacy rationale of our exclusionary rule, one could argue that evidence obtained in Hawai'i by federal officers in compliance with federal law (and therefore not illegally obtained) but in violation of some more restrictive aspect of Hawai'i law should be suppressed in criminal prosecutions in Hawai'i state courts. *See State v. Rodriguez,* 110 Or.App. 544, 823 P.2d 1026, 1029–30 (1992), *rev'd on other grounds,* 317 Or. 27, 854 P.2d 399, 403–04 (1993); *cf.* Quigley, *supra,* at 325 ("In the case of evidence illegally seized by federal officers that is admissible in federal court because of an exception to the federal exclusionary rule, states should exclude the evidence consistent with their own exclusionary rule."). In

the instant case, however, we need not, and do not, decide that issue.

16. Some cases have gone so far as to hold that the deterrence rationale did not require suppression even when the evidence at issue was obtained by agents of the situs state in violation of situs law. In *People v. Porter, supra,* for example, the Colorado Supreme Court ruled as follows:

In cases such as this one, the officers involved were investigating crimes of [the situs] jurisdiction in [the situs] jurisdiction. Those officers had taken an oath to uphold the laws of [the situs] jurisdiction. If they fail to follow the laws of [the situs] jurisdiction, they run the

Even if some deterrent effect is recognized in cases involving evidence obtained by situs agents in a manner valid in the situs but invalid in the forum, practical considerations regarding the utilization of the exclusionary rule to achieve such deterrence far outweigh the minimal deterrence that could be expected. Professor Corr explains as follows:

Police knowledge of controlling law is, of course, central to the deterrent purpose behind exclusionary rules. Police who are unaware of applicable law will not be deterred from violating it. When forum-biased interest analysis imposes on the police of another state the additional burden of learning the law of the forum—or facing the consequences that evidence obtained will not be admitted in the forum—interest analysis merely causes suppression of probative evidence, without deterring police misconduct.

. . . .

Even the farfetched prospect of impromptu instruction in another state's law would not make forum-biased interest analysis more realistic. In some cases, police may have no opportunity to learn in advance which jurisdiction will receive the evidence they obtain.

Corr, *supra*, at 1229. Similarly, Professor Theis writes:

A factor of administrative convenience also supports deference to the law of the place where the investigation is made. The officers of a jurisdiction would be hard pressed to conduct their investigations by more than one set of rules. It would be unreasonable to require that state officers know the rules of all fifty states.... More importantly, the officers might not be aware of the foreign nature of their investigation at the time of the investigation and would be in a poor position to apply foreign rules even if they knew the content of foreign law.

Theis, *supra*, at 1048–49 (footnote omitted).

Many of the same courts and commentators, however, also recognize or suggest that the deterrence rationale is applicable when forum agents participate in the seizure of the evidence in the situs state. In *People v. Mattson*, *supra*, for example, the Supreme Court of California ruled as follows:

We begin with the proposition that, as explained above, [the evidence] would be inadmissible ... in [the forum state]. We may also assume, for purposes of analysis only, that [the evidence] would be admissible under [situs state] law.

[T]he deterrent purpose that underlies the ... exclusionary rule is no less implicated here simply because the [evidence was obtained in the situs state]. [Some of the evidence was obtained] by a [forum state] officer, and [the other evidence], although [obtained] by a [situs state] officer, was clearly the result of close collaboration with [forum state] police.

It is well established that exclusionary rules may apply to a search or interrogation by agents of foreign countries if United States officials participate sufficiently in the search or interrogation.[17] By analogy to these cases, we conclude that the ... exclusionary rule applies here. [The evidence was obtained] in violation of [the forum state's constitution], and [was obtained] by a [forum state] officer or his agent. To sanction such interrogations would encourage [forum state] police to engage in activities outside our borders

risk that evidence obtained will be excluded in the cases they investigate. If that is not enough to deter them from misconduct, it does not seem likely that the slight increment in deterrence achieved by suppressing the evidence in [the forum] jurisdiction will have any effect.

742 P.2d at 926. Similarly, in *People v. Orlosky, supra*, where a seizure had occurred in the situs state in violation of situs law, "[o]n the question of deterrence, the court determined that [the forum state]'s interest in successfully prosecuting crime was not outweighed by [the situs state]'s interest in disciplining its own police since [the situs state] could control its officers adequately by applying its rules in prosecutions in that state." *Blair*, 159 Cal.Rptr. at 828 n. 12, 602 P.2d at 748 n. 12.

17. We note that the federal cases holding that the exclusionary rule of the Fourth Amendment applied to searches conducted by United States officials outside of the United States were effectively overruled by *United States v. Verdugo-Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).

that violate our own constitutional standards.

207 Cal.Rptr. at 282, 688 P.2d at 891 (citations and original footnote omitted) (footnote added). *See also* Theis, *supra*, at 1049 ("State agents are ... bound ... by state law when they operate outside their state.... In this setting, the legitimacy of control over forum agents is unquestioned. No foreign interest is disserved if forum agents are required to follow more stringent guidelines than those laid down in the law of the host country.").

We agree that application of the exclusionary rule to suppress evidence in criminal prosecutions in the forum state because of the conduct of forum agents acting in the situs state could be expected to have a "deterrent" effect on those forum agents, i.e., in the future, forum agents could be expected to act in a manner that would not lead to application of the exclusionary rule. The conclusion that use of the exclusionary rule could affect the future conduct of forum agents, however, does not resolve the issue of whether the exclusionary rule should be used to suppress evidence obtained by forum agents in conformity with situs law but in a manner that would have violated forum law. In order to resolve that issue, we must answer the question of how forum agents should act when participating in investigations in other jurisdictions. In conformity with situs law? In conformity with forum law? Both? [18]

Professor Morrison has discussed some of the policy reasons that would support requiring forum agents to comply with forum law (or both forum and situs law) when acting in the situs state as follows:

[When a search technique would have been valid in the situs state but invalid in the forum state, t]he forum should reason that displacing the forum's suppressing rule in favor of the situs' admitting rule tells forum police they are free of forum law constraints when they act outside the forum as long as they coordinate with situs police. That is an inadvisable message because for future searches wholly within the forum, these same forum police and their colleagues are likely to forget why the evidence of a similar search was not suppressed. The simpler and more comprehensible view is that when forum police search outside the forum in the company of situs police, forum police ought to continue to meet the standards of search-and-seizure privacy behavior expected at home. Refusing to displace the forum's evidence-suppressing rule in favor of the situs' rule will remind forum police to carry out searches and obtain warrants that meet the standards with which they already are familiar.... Admittedly, this case presents less demand for suppression under the forum's rule than if the search had occurred in the forum; but the demand merely is less, not nonexistent.

Morrison, *supra*, at 623–24.

We believe that the likelihood that forum agents will fail to abide by forum law when

---

**18.** One commentator has suggested that "neither" may be the most appropriate answer:

In state criminal prosecutions, when the acts of police of another state or of federal agents are challenged, and perhaps even when local law enforcers are acting outside their own jurisdiction, it may simply be better to apply the U.S. Constitution rather than any state constitution. After all, the U.S. Constitution was designed to provide uniform national rules for activities involving more than one state. Invoking federal law would preserve the prosecuting state's law enforcement interest. The states must grant rights at least as broad as federal rights, so law enforcement interests would not be sacrificed any more than is necessitated by the Supremacy Clause. Applying the federal constitution would also preserve state constitutional principles by avoiding the application of the constitution of State A to the

officials or territory of State B. It would obviate placing unreasonable compliance demands upon police, since all law enforcers must provide the minimally required federal rights. It would protect a defendant's federal constitutional rights, although broader rights promised by state law might be sacrificed. State courts would be able to operate on the familiar territory of U.S. constitutional law, rather that having to apply the law of another state. Finally, utilizing federal constitutional law would provide uniform law for all out-of-state situations; it would strike a blow for reduced law enforcement confusion.

Latzer, *supra*, at 885–86 (footnote omitted). Although this approach is perhaps the easiest of application, we are not convinced that simply requiring compliance with federal law in all interstate search and seizure cases is a just solution.

202

acting within the forum state because they were only required to act in accordance with some situs state's law on another occasion is misplaced. Forum agents, especially in Hawai'i, will not often be engaging in search activities in other jurisdictions. We cannot accept that such minimal exposure to situs law will cause our forum agents to forget Hawai'i law. Moreover, we are convinced that sounder policy reasons militate in favor of requiring forum agents to comply with situs law, preferably by seeking the assistance of situs officials before engaging in any search activities within the situs state.

First, and most important, it will bring a needed measure of predictability to police work. Police officers, like the rest of us, can be deterred only by laws and sanctions whose intricacies and applicability they comprehend. The practice of applying forum law ... usually guarantees that the situs police, who undertake a search or interrogation, will not have such knowledge. Application of situs law, on the other hand, offers a greater prospect that police will know which state's law is applicable; it will be identified readily as the law of the state in which police activity is undertaken. And because that state's police often participate in the search or interrogation, there will usually be someone on the scene who understands that law as well as any police officer is likely to understand it.

Corr, *supra*, at 1234 (footnotes omitted). *See also Gerena*, 667 F.Supp. at 917–18.

Thus, we will follow the suggestion of Professor Morrison set forth below:

[W]hy not just say the forum needs to have a substantive rule that directs forum police to act in concert with situs police except in extraordinary circumstances? ... If forum police do not comply with the directive, the forum's own exclusionary rule should require suppression. If forum police do act in combination with situs police, presumably the search will be lawful because situs police will know what situs law is.

Morrison, *supra*, at 604–05 (footnote omitted).

Therefore, in the ordinary case in which forum agents obtain evidence in another state, they should be expected to comply with the situs state's law. If they do so, there will ordinarily be no need to "deter" them. If necessary, however, exceptions to this general rule may be made. For example,

[i]f [forum state] police set out consciously to evade [forum state] law, their expectations about the application of [situs state] law are not those of reasonable police trying to conform to applicable law, but rather of vigilantes with badges who seek to frustrate the purpose behind their own state's exclusionary rules. Situs law should not be used to reward such schemes.

Corr, *supra*, at 1238.

In the instant case, the Hawai'i agents did coordinate their efforts with California law enforcement officials. In doing so, they apparently conducted their activities in compliance with California law. *See supra* note 10. Furthermore, there is no indication in the record that the Hawai'i agents set out consciously to evade Hawai'i law by conducting the electronic eavesdropping activities in California. Therefore, we conclude that the deterrence rationale does not support suppression of the evidence at issue.

The result of the exclusionary rule analysis is clear. None of the three rationales of our exclusionary rule—i.e., judicial integrity, individual privacy, and deterrence—support suppression of the evidence at issue in the instant case. Therefore, we hold that the circuit court erred in granting the appellees' motions to suppress evidence.

### III. *CONCLUSION*

For the foregoing reasons, we reverse the circuit court's order granting Bradley's motion to dismiss as applied to the conspiracy charge. In addition, we reverse the circuit court's orders granting the appellees' motions to suppress evidence. Accordingly, we remand this case for further proceedings on the conspiracy charges against the appellees.